M & M SUPERMARKETS, INC.,
Petitioner, Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,
Cross-Petitioner.

No. 86–8469.

United States Court of Appeals,
Eleventh Circuit.

June 12, 1987.

---

James F. Smith, Atlanta, Ga., for petitioner, cross-respondent.

Elliott Moore, N.L.R.B., Allen R. Ferguson, Jr., James M. Darby, Linda Dreeben, Washington, D.C., Fredrick C. McLam, Decatur, Ga., for respondent, cross-petitioner.

Before HILL and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

The petitioner, M & M Supermarkets, Inc., a supermarket chain in Savannah, Georgia, appeals from an order of the National Labor Relations Board, that it cease and desist from refusing to bargain with Truck Drivers and Helpers Local 728, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, as the exclusive bargaining representative of the employees in the bargaining unit at M & M's Supermarket Distribution Center in Savannah, Georgia.

The Board found that M & M Company, by refusing to bargain with the Union as the exclusive collective-bargaining representative of employees in the appropriate unit after a representation election, has engaged in unfair labor practices affecting commerce within the meaning of Section 8(a)(1) and (5) and Section 2(6) and (7) of the Act. The petitioner's refusal to bargain with the Union stems from its objection to certain statements made by an employee during a representation election, which it claims destroyed the laboratory conditions for conducting a free and open election,

and thus warrants setting aside the election and requiring a new election. This case is before the Court on the petition of the company, pursuant to Section 10(f) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(f) to review and set aside the order of the NLRB directing the Company to bargain with the Union. The Board filed a cross-application, requesting enforcement of its order.[1]

## BACKGROUND

Norton and Millicent Malaver were the sole shareholders of the privately held M & M Supermarkets, Inc. Norton Malaver is the president of the Company and his sister, Millicent Malaver, is the vice president. They are citizens and are active in Savannah's community affairs. M & M Supermarkets has for many years operated a chain of retail grocery stores in and near Savannah, Georgia. Groceries and produce are delivered to the store from the Savannah distribution center and warehouse, in company-owned trucks, which are operated by Company drivers and are maintained by Company mechanics.

On February 21, 1985, the Teamsters Union filed a representation petition with the Board seeking certification as the exclusive collective bargaining representative of the Company's employees at its distribution warehouse. Following a hearing on the petition, the Board's regional director issued a Decision and Direction of Election in an appropriate unit.[2]

On April 19, 1985, the Board conducted a secret ballot election. There were approximately 17 eligible voters in the unit. The Truck Drivers and Helpers Local Union 728, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters) received nine votes; M & M Supermarkets received seven votes; and two votes were challenged. Of these two votes, one was stipulated by the parties to be invalid and, therefore, there was one challenged ballot remaining which would not have affected the outcome of the election. However, a switch of one vote, from the Union to the management, would have resulted in a tie vote and no bargaining certification. The Union, therefore, won the election. However, the Company then filed timely objections to the election, alleging in part, that the Union and its supporters inflamed religious tensions prior to the election, thereby destroying the requisite laboratory conditions mandated by the Board for representation elections.

During the course of the election campaign, the Company's personnel director, Shirley Patrick, conducted a series of meetings with eligible bargain unit employees. These meetings were designed to apprise the employees of the Company's position regarding the Union. At a meeting held by Ms. Patrick at 8:00 a.m. on April 3, 1985, Charles Wade, an outspoken Union supporter and advocate, stood up and made a series of inflammatory statements following Ms. Patrick's presentation. The petitioner contends that Wade began to berate and castigate the Company owners in the following fashion:

> The damn Jews who run this Company are all alike. They pay us pennies out here in the warehouse, and take all their money to the bank. The Jews ought to remember their roots. Norton Malaver ought to remember his roots. Us blacks were out in the cotton field while they, the damned Jews, took their money from the poor hardworking people.

As Ms. Patrick attempted to defend the reputation of Norton Malaver and his family as liberal and community minded people, Charles Wade angrily interrupted her, and continued loudly, stating: "I want Norton Malaver to come out and talk to me, and

---

1. The Board's Decision and Order is reported at 280 NLRB 40 (1986).

2. The unit is:

   All full-time and regular part-time truck drivers and shop and forklift maintenance mechanics, including tractor-trailer drivers, and straight drivers employed by the Company at its Savannah, Georgia Central Warehouse, and its Savannah, Georgia Farmers Market location; but excluding all traveling maintenance mechanics, the mail carrier, office clerical employees, guards and supervisors as defined in the Act.

I'll tell him what he is." When told that Mr. Malaver intended to speak with all employees, Charles Wade stated: "Good, I'll be waiting. I'll tell him what he is. Those damned Jews are no good."[3]

Thereafter, pursuant to the Board's Rules and Regulations, § 102.69(d), Series 8, as amended, the regional director of the NLRB issued an order directing that a hearing be held before a duly designated hearing officer of the NLRB on the appellant's objections and the challenged ballots, where all the parties were afforded a full opportunity to be heard, to examine and cross-examine witnesses and to introduce evidence pertinent to the issues. Following a hearing on the Challenged Ballots and Objections to Election, the hearing officer issued a Report and Recommendations, recommending that the objections be overruled, and that the Union be certified as the exclusive bargaining representative of the Company's employees.

The Company filed timely exceptions to the hearing officer's report. In his report, the hearing officer stated that he did not agree with the employer's assertions that Wade's remarks were imputable to the Union or that they inflamed racial or religious tension during the campaign, thereby destroying the conditions prerequisite for employees to make a free and uncontrolled choice. The hearing officer concluded that although Wade was a Union supporter, he was not an agent of the Union, nor was there evidence that the Union either authorized or condoned or was even aware of Wade's remarks.

As to the appeal on the tendency to create religious tensions, the hearing officer stated that Wade's remarks were made in the presence of only three employees, out of a unit of 17 employees, and that there was no evidence that the remarks were disseminated to other employees. The

hearing officer also pointed to the testimony of another employee, that Wade's remarks did not in any way influence his decision when he voted in the election.

In overruling the Company's objections, the hearing officer concluded that the disparaging remarks regarding Jews and Malaver's religion did not rise to the level of inflammatory remarks, so as to make a fair election impossible.

On December 2, 1985, the NLRB issued a decision and certificate of representation, adopting the hearing officer's recommendation to overrule the Company's objection and certifying the Union as the bargaining agent of the employees.

In its order, the Board concluded that it had reviewed the record and adopted the hearing officer's findings and recommendations, and found that a certification of representation should be issued.

First, the Board adopted pro forma, the hearing officer's recommendations with respect to the challenged ballots.

Second, as to the hearing officer's recommendations to overrule the employer's objection to the conduct of Charles Wade, the Board upheld the hearing officer's decision, based on the following reasons:

(1) The evidence was insufficient to support a finding that Wade acted as the Petitioner's agent during the election campaign; and (2) Wade's campaign activities were unobjectionable as third party conduct, nor was it sufficient to create an atmosphere of confusion and fear of reprimand which rendered a fair election impossible.

### The Proper Standard of Review in Election Misconduct Cases

### 1. The Appellant's Position

First, M & M Supermarkets argues that the Board failed to apply the proper legal

---

**3.** The evidence further established, and the hearing officer found, that Wade had referred to the Company on other occasions, as being operated by "sorry Jews," "damned Jews," and "tight wads" in conversations with the Company's shipping clerk, Allen Rowe. However, the hearing officer found that those remarks were made to Rowe, who was an ineligible voter, who

never communicated the remarks to any employees; the hearing officer concluded that he could not find that those comments had a "tendency to influence" any potential voters, citing Ziegler Refuse Collectors, 245 N.L.R.B. 449 (1979). The hearing officer, therefore, overruled the Company's objections based on those alleged remarks made to employee Rowe.

standard for reviewing election misconduct involving anti-Semitic statements and inflammatory racial appeals, made to fellow employees during the course of a union election campaign. According to petitioner, in reviewing the Company's objections to the representative election, and the hearing officer's report, the Board concluded that the employee's "conduct was not sufficient to create a general atmosphere of confusion and fear of reprisal which rendered a fair election impossible." However, M & M contends that the "general atmosphere of confusion and fear of reprisal" standard, relied on by the board, is relevant only in cases in which the facts establish threats of physical violence and/or retaliation against union employees. *See, e.g., RJR Archer, Inc.*, 274 NLRB No. 49 (1985) (evidence of threats of violence and retaliation to the employees); *Westward Horizons Hotel*, 276 NLRB 802 (1987).

In reviewing religious or racial statements in the context of a representation election, the petitioner argues, the proper inquiry becomes whether such appeals were designed to inflame "the racial (or anti-Semitic) feelings of the voters" and whether they had a tendency to influence the outcome of an election, citing *Sewell Manufacturing Co.*, 138 NLRB 66 (1962); *NLRB v. Gulf State Canners, Inc.*, 585 F.2d 757 (5th Cir.1978), *cert. denied*, 452 U.S. 906, 101 S.Ct. 3033, 69 L.Ed.2d 407 (1981). The petitioner relies on this "tendency to influence" standard, as described by the Court in *NLRB v. Gulf States Canners, Inc.* In *Gulf States*, the Court noted the difficulties in assessing the effect of a particular action of the Union electorate. This is because, the Court stated:

> [D]etecting the subjective reaction of employees to electioneering requires an expedition into the thought processes of the electorate, a journey that administrators and courts are ill-equipped to make. To eliminate this invitation to speculate, the Board should not attempt to plumb the subconscious. Rather, the assay should seek to find whether the questioned action by an election candidate had a tendency to influence the outcome of the

> voting. *If the challenged action had a tendency to influence the outcome of the election*, then the election should be invalidated.

585 F.2d at 757 (emphasis added.)

M & M argues that a consideration of all the facts in the record using the proper legal standard requires the court to conclude that Wade's religious appeals were designed to inflame the religious prejudices of the voters and to influence the outcome of the election.

### 2. *The Board's Position*

The Board, on the other hand, contends that it reasonably exercised its discretion in applying the third party standard for evaluating pre-election conduct and in finding that the employee's misconduct was insufficient to create an atmosphere in which a fair election was impossible. The Board argues that where racially prejudicial statements emanate from a third party, such statements warrant invalidating an election, only if they are so "coercive and disruptive that a free expression of choice of representatives is impossible," citing *N.L.R.B. v. Heavy Lift Services, Inc.*, 607 F.2d 1121, 1123 (5th Cir.1979) quoting *Federal Corp. v. N.L.R.B.*, 539 F.2d 1043, 1044 (5th Cir.1976); and *Bush Hog, Inc. v. N.L.R.B.*, 420 F.2d 1266, 1269 (5th Cir.1969).

The Board notes that it has long been sensitive and responsive to deliberate attempts by parties to inject elements of racial and religious prejudice into a representation campaign for the sole purpose of inflaming the passions and prejudices of voters. *See, e.g., Sewell Manufacturing Co., supra.* Both the Board and the petitioner cite the Board's decision in *Sewell Manufacturing Co.*, where the Board first enunciated the standard to be applied in election cases involving racially inflammatory appeals.

In *Sewell*, the Board set aside an election where the employer injected racial issues in the campaign by associating the union with the Civil Rights movement. First, the Board noted that a Board election is not identical to a political election, where public

officials conducting the election have no responsibility beyond the mechanics of the election. By contrast, the Board stated:

> [T]he Board not only conducts elections, but it also oversees the propaganda activities of the participants in the election to insure that the voters have the opportunity of exercising a reasoned, untrammeled choice for or against labor organizations seeking representative rights. *The Board has said that in election proceedings it seeks "to provide a laboratory in which an experiment may be conducted under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." Where for any reason the standard falls too low the board will set aside the election and direct a new one.* Unsatisfactory conditions for holding elections may be created by promises of benefits, threats of economic reprisals, deliberate misrepresentations of material facts by an employer or a union, deceptive campaign tactics by a union, or by *a general atmosphere of fear and confusion caused by a participant or by members of the general public. Standards, particularly those of permissible propaganda, are not fixed and immutable.* They have *been charged and refined, generally in the direction of higher standards.*

*Id.,* at 70 (emphasis added.) In the instant case, the Board found that Wade's conduct was not sufficient to create a "general atmosphere of confusion and fear of reprisal which rendered a fair election impossible."

In determining the proper standard to be followed in a case where there is misconduct emanating from a third party, we note that this Court has worded differently the applicable standards at different times. In *N.L.R.B. v. Heavy Lift, Inc.,* 607 F.2d 1121 (5th Cir.1979), the Fifth Circuit held that "where conduct [is] not attributable to the opposing party [it] cannot be relied upon to set aside an election" unless it is so "coercive and disruptive ... that a free expression of choice of representation is impossible." 607 F.2d at 1121 (5th Cir.1979).

Similarly, in *N.L.R.B. v. Golden Age Beverage Co.,* 415 F.2d 26, 32–33 (5th Cir. 1969), the Fifth Circuit held that "misconduct, not attributable to the union, may nevertheless warrant setting aside an election if it disrupted the voting procedure or *destroyed the atmosphere necessary to the exercise of a free choice* in the representation election." 415 F.2d 26, 32 n. 5, citing *Hometown Foods, Inc. v. N.L.R.B.,* 379 F.2d 241 (5th Cir.1967) (emphasis added.) The standard enunciated in *Golden Age* has most often been applied in cases where physical threats, or acts of violence, were alleged to operate to destroy the atmosphere necessary to the exercise of free choice in representative elections.

In *N.L.R.B. v. Claxton Mfg. Co., Inc.,* 613 F.2d 1364 (1980), the Fifth Circuit applied the "third party test" enunciated in *Golden Age* to employee statements about threats, physical acts of violence, and intimidation, which the Court found constituted a prima facie showing of an atmosphere of fear and confusion. Likewise, in *N.L.R.B. v. Carroll Contracting & Ready Mix,* 636 F.2d 111 (5th Cir.1981), the third party test was applied by this Court to acts of improper electioneering, which occurred at the election polls, and which necessitated overturning the election. There, the Court addressed the Board's contention that the electioneering was not improper, because the employees were not agents of the union, and therefore their conduct could not be attributable to the union. The Court stated:

> We disagree. It is well settled that acts not attributable to the union warrant setting aside the election if the acts disrupted the voting procedure *or destroyed the atmosphere necessary to the exercise of a free choice in the representation* election.

Citing *N.L.R.B. v. Claxton Manufacturing Co.,* 613 F.2d 1364, 1371 (5th Cir.1980) (emphasis added.).

■ We are thus called upon to determine whether the acts of Wade, although not attributable to the Union, "destroyed the atmosphere necessary to the exercise

of a free choice in the representation election."

First, and foremost, this Court has held that Union elections should be conducted under *laboratory conditions* and that an election must be invalidated upon a finding of a substantial breach of those conditions. *N.L.R.B. v. Handy Hardware Wholesale, Inc.*, 542 F.2d 935, 938 (5th Cir.1976); *cert. denied*, 431 U.S. 954, 97 S.Ct. 2675, 53 L.Ed.2d 271 (1977).

In *Hometown Foods, Inc. v. N.L.R.B.*, 416 F.2d 392 (5th Cir.1969), the former Fifth Circuit stated "the 'laboratory conditions' test represents an ideal atmosphere in which a free choice may be made by employees, protected from interference by employer, union, Board agent, *or other parties.*" 416 F.2d at 396 (emphasis added.) Indeed, the Board set this standard for itself in *Sewell:* "In election proceedings it [the Board] seeks to *provide a laboratory* in which an experiment may be conducted, under conditions as nearly as ideal as possible, to determine the uninhibited desire of the employees." *Sewell, supra*, at 70 (emphasis added.)

■ However, we note that the burden is on the "party objecting to the conduct of the election to prove that there has been prejudice to the fairness of the election." *Southwestern Portal Cement Co. v. N.L.R.B.*, 407 F.2d 131, 134 (5th Cir.1969). Indeed, this is a heavy burden, whether the alleged acts are acts of violence, physical threats, or racial or religious remarks.

■ The Board has wide discretion in determining whether an election has been fairly conducted, and its decisions warrant special respect on review. *See, e.g., Gulf Coast Automotive Warehouse Co. v. N.L.R.B.*, 588 F.2d 1096 (5th Cir.1979).

■ Due process requires the Board to grant "a [post-election] hearing to a losing party who has supplied prima evidence raising substantial and material issues that would warrant setting the election aside." *Gulf Coast, supra*, at 1100. However, the issue whether the employer has made an adequate showing is a "question of law and ultimately a question for the courts." *N.L.*

*R.B. v. Claxton Mfg. Co., Inc., supra*, at 1365, quoting *Luminate Division of Galton Industries, Inc. v. N.L.R.B.*, 469 F.2d 1371, 1374 (5th Cir.1972), quoting *N.L.R.B. v. Bata Shoe Co.*, 377 F.2d 821, 826 (4th Cir.), *cert. denied*, 389 U.S. 917, 88 S.Ct. 238, 19 L.Ed.2d 265 (1967).

In the instant case, the Board found that Wade's conduct "was not sufficient to create a general atmosphere of confusion and fear of reprisal which rendered a fair election impossible."

We hold, however, that the Board erred in applying the test of coercion and fear of reprisal in determining whether a fair election was possible. The Board, itself, adopted a standard in *Sewell*, for determining whether racially inflammatory remarks interfere with the free choice of an election. There, the Board stated:

So long, therefore, as a party limits itself to truthfully setting forth another party's position on matters of racial interest and does not *deliberately seek* to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the *total conduct* of such party is within the described bounds, the doubt will be resolved here.

*Id.*, at 72 (emphasis added).

In *Sewell*, the Board found that the racially inflammatory remarks "exceeded permissible limits and so inflamed and tainted the atmosphere in which the election was held that a reasoned basis for the choosing or rejecting a bargaining representative was an impossibility." *Id.*, at 72.

■ It seems that the Board could not have found otherwise in this case. Wade's remarks were so inflammatory and derogatory that they inflamed racial and religious tensions against the Jewish owners of the company and destroyed the laboratory condition necessary for a free and open election. The record shows that Wade's remarks were made in front of three other

employees. There were 17 employees in the bargaining unit, and the Union won the election by a vote of nine to seven, with two challenged ballots.

We hold that the Board failed to apply the proper legal standard to determine whether Wade's remarks "disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election." *N.L.R.B. v. Claxton Mfg. Co., Inc., supra,* at 1371.

We are mindful of our society's public intolerance of racial and religious discrimination as evidenced in our Civil Rights statutes. Although feelings of racial and religious bias may, unfortunately, be harbored personally, an appeal to such feelings has no place in our system of justice. *See United States v. Heller,* 785 F.2d 1524 (11th Cir.1986). Neither does it have any place in a union election if it unduly interferes with holding such an election under "ideal" or "laboratory" conditions as outlined by this Court's decisions.

The petition to deny enforcement of the Board's Order is GRANTED.

ENFORCEMENT DENIED.