NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

HERBERT HALPERIN DISTRIBUTING CORPORATION, Respondent.

No. 86–3630.

United States Court of Appeals, Fourth Circuit.

Argued April 7, 1987.
Decided Aug. 14, 1987.

---

Warren M. Davison (Leslie Robert Stellman, Benjamin W. Hahn, Little, Mendelson, Fastiff & Tichy, Baltimore, Md., on brief) for respondent.

Arthur M. Radin, N.L.R.B. (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Howard E. Perlstein, Supervisory Atty., Washington, D.C., on brief) for petitioner.

Before HALL and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WILKINSON, Circuit Judge:

We confront here a challenge to union certification after an election in which racial appeals and animosities allegedly played some part. On June 21, 1984, two local unions affiliated with the International Brotherhood of Teamsters filed a joint certification petition for the truckdrivers and warehouse employees at Herbert Halperin Distributing Corporation. The election was held August 9, 1984, and the vote was 58 for union representation and 34 against it. The company filed timely objections to the election, alleging that employees acting as union agents coerced fellow employees to support the union with threats and appeals to racial prejudice. The union denied that any of the coercive incidents occurred and denied that the employees allegedly involved were its agents. After an investigation, the Regional Director recommended overruling the objections. The company filed exceptions, urging the Board to overturn the election or to order a hearing on the objections. The Board adopted the Regional Director's report and certified the union on March 13, 1986.

Halperin refused to bargain, stating that it intended to seek judicial review of the Board's certification. Thereafter, the unions filed section 8(a)(5) and (1) charges, and the General Counsel issued a complaint. On May 30, 1986, the General Counsel moved for summary judgment. The Board granted the motion, finding that

the objections raised by the company had already been litigated in the underlying representation proceeding and that no special circumstances warranted a review of that proceeding. It ordered the company to bargain. Because we believe that the union was properly certified, we order enforcement.

## I.

In its objections to the election, Halperin alleged that union agents attempted to force employees to vote for the union with threats of physical and economic harm and with appeals to racial prejudice. It documented these allegations in affidavits by four employees. In his Report on Objections, the Regional Director referred to these employees as A, B, C and D for purposes of confidentiality. He summarized the following incidents described in the affidavits:

Employee A stated that Karen McDuffy whom A identified as the union's election observer, "confronted A and questioned A about her feelings" toward the union and asked why she did not support the union. A also stated that McDuffy tried to get her to sign a union card and to attend union meetings. When A refused, McDuffy allegedly harassed A on the job "by making insulting remarks, by whispering to other employees derisively about A, and by forcing A to perform extra work." The Regional Director also stated that McDuffy, in the presence of others, called A "stupid" and "dumb" for not supporting the union. The report contains A's statement that McDuffy " 'may have told me sometime a few weeks before the election, that I would have some sort of problems for not supporting the Union.' "

Employee B stated that, about four weeks before the election, he was approached by Robert Looper, another employee, who told him that "if B did not sign a union authorization card, B would lose B's job when the Union came in." B also reported that Looper told him that the company made work assignments on the basis of race. According to the Regional Director's report, B further stated that Dar-

nell Jeffries, a black employee, told B that B would get more respect if he let other employees know that he was voting for the union.

Employee C stated that about two weeks before the election, Looper approached him and another employee and "asked if they had signed a union card, as the union representatives knew who signed and didn't sign cards, and if they did not sign one they would lose their jobs." When C refused Looper's offer to bring him a card, Looper said "it was C's job." Looper also told C that " 'the white guys should get together and help the black guys because you'll lose your jobs by not signing union cards.' " A few days later, Jeffries and employee Jose Middleton, told C that if he didn't sign a card, he would lose his job " 'because the union representatives knew who signed a card.' " When C went to vote, the Board agent asked him to spell his name. The union observer, Charles Riley, interrupted him, saying " 'you don't have to spell it, just get in there and vote.' "

Employee D stated that Riley, for a number of weeks up to the time of the election, asked D how he felt about the union and insisted that he support the union by attending meetings, wearing a button, and voting for the union. On one occasion, when D refused to wear a button, D said that Riley "became loud and forceful and said 'Boy, you white sons-of-bitches, you are all the same, you're scared to take a stand.' " D also stated that he overheard Riley saying "those goddamn white boys— they're gonna vote no with Mr. Halperin, they won't support the blacks." Later, Riley asked D if he was going with the rest of the whites. D said that Riley told him " 'somewhat in a menacing and threatening manner that he had better be at the union meetings.' "

The Regional Director found the union supporters involved in these incidents were not acting as union agents. He also found that the allegedly threatening remarks were not severe enough to have destroyed free choice even if made by a union representative. In addition, the Regional Director found that the racial remarks were

not a basis for overturning the election, even if made by a union agent, because they appealed "to solidarity rather than to racial prejudice" and they did not "seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals."

The Director sent his report and recommendations to the Board, but he did not append the affidavits of the employees he identified as A, B, C and D. The company attempted to file these affidavits with the Board in its exceptions to the Regional Director's report, but, to protect the employees' identities, did not serve them upon counsel for the union. The Board refused to consider the affidavits because they were not served on the union.

After the company filed its exceptions to the Regional Director's report but before the Board issued its decision, the company moved to adduce additional evidence on the issue of whether McDuffy, Middleton, Riley, Jeffries and Looper were agents of the union. The company produced a copy of the union newspaper, the Local Vocal, which featured a front-page article about the union's victory and photograph picturing a group of employees including Looper, Jeffries and Middleton. The caption under the photo stated "Teamster Victory is celebrated by leaders of winning campaign" and identified each employee by name. The text of the article credited Riley and McDuffy for playing "significant roles in the Halperin victory." The Board denied the company's motion to make this evidence part of the record, stating that it "lacked merit."

Halperin argues on appeal that the Board abused its discretion in upholding the election and in failing to order a hearing on the objections, and that it erred in excluding the company's affidavits from the record. We reject these assignments of error and order enforcement.

## II.

■ Halperin argues that the alleged threats of violence and job loss and the appeals to racial fears warrant setting the election aside. In so arguing, he bears a heavy burden. While the Board strives to maintain "laboratory conditions," *General Shoe Corp.*, 77 NLRB 124, 127; *YYK (USA), Inc.*, 269 NLRB 82 (1984), in reality these conditions are often "less-than-perfect." *See Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1005 (3d Cir.1981); *NLRB v. Sumter Plywood Corp.*, 535 F.2d 917, 927 n. 15 (5th Cir.1976), *The Liberal Market, Inc.*, 108 NLRB 1481, 1482 (1954). An election by its nature is a heated affair. Coercive conduct is never condoned during the election process, but the Board will not set aside an election unless an atmosphere of fear and coercion rendered free choice impossible. *Abbott Laboratories v. NLRB*, 540 F.2d 662, 667 (4th Cir.1976); *Beaird-Poulan Div. v. NLRB*, 649 F.2d 589, 592 (8th Cir.1981). Halperin must show by specific evidence "not only that improprieties occurred, but also that ... they materially affected the election results." *Beaird-Poulan Div. v. NLRB*, 649 F.2d at 592. In making this determination, the status of those who made the alleged statements is relevant.

■ Less weight is accorded the comments and conduct of third parties than to those of the employer or union. *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239, 1242 (4th Cir.1976). The obvious reasons are that third parties are not subject to the deterrent of having an election set aside, and third party statements do not have the institutional force of statements made by the employer or the union. An election will thus be set aside for third-party conduct only if "the election was held in a general atmosphere of confusion, violence, and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render impossible a rational uncoerced expression of choice as to bargaining representation." *Methodist Home v. NLRB*, 596 F.2d 1173, 1183 (4th Cir.1979).

■ In their briefs and at oral argument, both the company and the Board debated strenuously whether or not the employees involved here were properly categorized as "third parties" or "union agents." This distinction is a fine one. Employees invari-

ably become involved in representation campaigns. The Act protects such involvement and encourages a free-wheeling debate during the election process. Not every employee who supports the union or speaks in its favor is a union agent. Such employees may be acting for their own self interest, *see Bufkor-Pelzner Division, Inc.*, 197 NLRB 950, 950 (1972), and neither the union nor the employer can control everything these employees say or do. *Beaird-Poulan*, 649 F.2d at 594; *Zeiglers Refuse Collectors, Inc. v. NLRB*, 639 F.2d 1000, 1005 (3d Cir.1981). "The final inquiry is always whether the amount of association between the union and the [employees] is significant enough to justify charging the union with the conduct." *PPG Industries v. NLRB*, 671 F.2d 817, 822 n. 8 (4th Cir. 1982).

Halperin contends that McDuffy, Looper, Riley, Jeffries and Middleton are union agents under this court's decisions in *NLRB v. Georgetown Dress Corp.*, 537 F.2d 1239 (4th Cir.1976), and *PPG Industries*, *supra*. We note, however, that the indicia of agency in this case are far less compelling than in those cases. In *Georgetown Dress*, the organizing drive was run by a well-defined group of employees called the In-Plant Organizing Committee. The union "deputized" the committee members to solicit and collect authorization cards, to visit employees' homes, to pass out union leaflets, and to perform other organizing tasks. *Id.* at 1243. Because the union's professional staff had no contact with rank-and-file employees, the committee represented the union in every way during the campaign. This court found the committee members to be union agents because they were "the union's only in-plant contact with the workers," *id*, and because they "in the eyes of the other employees were the representatives of the union on the scene and the union authorized them to occupy that position," *id* at 1244.

Similarly, in *PPG Industries*, the campaign was conducted by employee members of the In-Plant Organizing Committee (IPOC). Employees had to sign up to become IPOC members, and the union expressly notified the company of their membership. IPOC members signed and distributed union literature, and solicited and transported membership cards to the union office. The court noted that these employees acted as the union's "eyes and ears" in the plant, *id.* at 819, and functioned as the union's "alter ego," *id.* at 821. Although one professional organizer was involved in the campaign, her contact with rank-and-file employees was minimal compared to that of the 300–member IPOC working in a bargaining unit of over 1400 employees.

Nothing of that sort exists here. Employees B and C identified Looper, Jeffries, and Middleton as "outspoken union supporters", but there was no evidence that rank-and-file employees viewed them as union representatives authorized to act for the union. In addition, the evidence shows that the professional union staff was heavily involved in the campaign, and that it, not the employees, signed and distributed the union's literature, conducted the union's meetings, and kept track of the authorization cards.[1] The evidence of agency is thus tenuous at best, a fact that frames our perspective on the statements at issue.

---

1. Halperin asserts that the Regional Director abused his discretion in failing to order a hearing on the issue of agency in light of the article in the union's newspaper describing Jeffries, Looper, and Middleton as employee "leaders" in the campaign, and identifying Riley and McDuffy as "playing a significant role." In support of its contention, Halperin cites *NLRB v. J-Wood*, 720 F.2d 309 (3d Cir.1983) in which a divided panel held that an evidentiary hearing on the question of agency was warranted because a post-election union publication identified an employee who allegedly threatened others as a member of the "plant committee" and coupled his name with professional staff organizers. In ordering an evidentiary hearing, the court relied heavily on the closeness of the vote. *Id.* at 315, 317. It was 21 to 20 in favor of the union.

The facts in this case differ from the facts in *J-Wood*. Here, the article sounds no more than the usual post-election celebratory notes. It does not establish the existence of an in-plant committee or the employees' membership in it. Further, it does not imply that the employees' role in the victory was comparable to that of the union's staff. Moreover, unlike *J-Wood*, the union in this case won by a large margin. *See Methodist Home, supra,* 596 F.2d at 1184.

### III.

◼ We decline to set aside the election or to order a hearing on the basis of those statements to which Halperin objects. The allegations simply do not rise to the level of viciousness or pervasiveness described in the cases on which Halperin relies, nor do they display the high degree of identification with the union. In essence, the allegations constitute little more than isolated remarks and name-calling among coworkers. We find some of those remarks unfortunate, but we think that it is unrealistic to expect every election dialogue to be completely sanitized.

In this case, the alleged threats of physical violence consist of employee A's statement that McDuffy "may have told me that I would have some sort of problems for not supporting the union" and employee D's statements that Riley spoke to him in a "forceful" and "somewhat threatening" manner. The allegations are vague at best. While hardly commendable, the conduct is not of the sort that would require an election to be set aside. *Cf. NLRB v. Van Gorp*, 615 F.2d 759, 763 (8th Cir.1980) (election set aside in light of threats to set fire to car and house, threats of harm to family, threats of broken arms); *YKK (USA), Inc.*, 269 NLRB 82, 82 (1984) (election nullified where at least two attempts to run employees off the road, lugs removed from tires of cars causing car tire to fall off while car in motion; cut fuel line, intimidating phone calls to family); *Georgetown Dress*, 537 F.2d at 1241–42 (election set aside where union agents made death threats, threats of "bloodshed"); *PPG Industries v. NLRB*, 671 F.2d at 819 (election overturned where agents made threats of home burning, threats of physical harm including "if we lose this election, we're going to whip your ass;" threats of cut automobile tires and broken windshields).

◼ In addition, the alleged threats of job loss here are insufficient to trigger an evidentiary hearing. *Bufkor-Pelzner*, 197 NLRB 950, 950 (1972) (threat of job loss discounted where not made by a union agent); *see also Sumter Plywood*, 535 F.2d at 922–23. The company offered no evidence that the alleged threats affected the election. The mere allegation of such a statement is not sufficient to show that the statements had any such impact. *Sumter Plywood*, 535 F.2d at 924. There was no showing that any employees on the receiving end of the threats alleged in this case had reason to believe that the company would fire them for not supporting the union. The situation lacks both the directness and immediacy of *Janler Plastic Mold*, 82 L.R.R.M. 2174 (7th Cir.1971), where both an in-plant organizer and union assistant business manager made threats of job loss to a specific group of employees just before a close election.

◼ Finally, we reject Halperin's contention that the alleged racial remarks require an evidentiary hearing. The allegations here do not reflect the combination of union involvement and racial, ethnic or religious prejudice that requires an election to be overturned. *See, e.g., NLRB v. Katz*, 701 F.2d 703 (7th Cir.1983) (election set aside due in part to Catholic priest's remarks at a union meeting about Jewish employer "getting rich while we're getting poor"); *NLRB v. Silvermans Men's Wear, Inc.*, 656 F.2d 53, 57 (3d Cir.1981) (hearing ordered where union official called company vice-president a "stingy Jew" at a union meeting); *YKK (USA), Inc.*, 269 NLRB at 84 (union officials exhorting workers not to let "the Japs ... pull the wool over your eyes," shouting "Go back where you came from, you damn Jap" to workers of Japanese descent, referring to "Japs" and "sneak attacks" in handbills). *Cf. Sumter Plywood*, 535 F.2d at 926 (no evidentiary hearing ordered where individual employees, not acting for union, developed a "black power", pro-union cheer).[2]

---

**2.** The recent decision of the 11th Circuit in *M & M Supermarkets v. NLRB*, 818 F.2d 1567 (11th Cir.1987), also differs from this case. In *M & M*, the court set aside an election in which a union supporter attacked the owners as "the damn Jews who run this company" and who "pay us pennies out here in the warehouse and take all their money to the bank" while "us blacks were out in the cotton field." 818 F.2d at 1569. These vicious remarks, made in an at-

No one condones the employees' use of racial epithets. In an ideal world, references to "goddamn white boys" and "white sons of bitches" would have no place. In the context of this election, we cannot disregard the Board's position that the remarks represented the dissatisfaction of black union supporters with the company's work assignments and their hope that whites would join blacks in supporting the union so that improved conditions might arrive for all. This election was waged primarily over money and working conditions. The remarks do not suggest an atmosphere inflamed by racial tension nor do they represent a deliberate attempt by the union to divert the employees from legitimate issues by insinuating an irrelevant appeal to race.

### IV.

 Appellant's final argument concerns the Board's refusal to include employee A, B, C and D's affidavits in the record. The Regional Director did not append the affidavits to his report for purposes of confidentiality. Halperin thereupon submitted the affidavits to the Board but refused to serve them on counsel for the union. It claims that the Board's refusal to accept the affidavits was prejudical error. We disagree.

The Board's rules allow a party to file exceptions to a Regional Director's report, including copies of any affidavits that it submitted to the Director but were not included in his report. 29 C.F.R. 102.-69(c)(2) and (g)(3). The Rules require that "the party filing with the Board exceptions to a report ... shall serve a copy thereof on the other parties." 29 C.F.R. 102.-69(j)(2). In *Seth Thomas Div.*, 262 NLRB 715, 715 (1982), the Board upheld its Executive Secretary's refusal to consider affidavits appended to the employer's exceptions but not served on the other party. In this case, Halperin could have complied with

tempt to influence the election by fanning prejudice against the company, "were so inflammatory and derogatory that they inflamed racial and religious tensions against the Jewish owners of the company and destroyed the laboratory conditions necessary for a free and open election."

the Board's requirements and preserved confidentiality by striking the employees' names from the affidavits before serving them on the union's counsel.

Further, Halperin was not prejudiced by the Board's refusal to accept the affidavits. Although it claims that the "tone" of the affidavits was lost in the Regional Director's summary, it does not allege the existence of any serious factual disputes that the affidavits would resolve. *See Prestolite Wire Div. v. NLRB*, 592 F.2d 302, 306 (6th Cir.1979). In its exceptions to the Regional Director's report, Halperin asserted that the summary was essentially accurate. We decline to deny enforcement of the Board's order on this ground.

ENFORCED.

818 F.2d at 1573. By contrast, the remarks in this case were not directed at the owners and do not reflect an attempt to win the election by creating animosity along religious or racial lines.