**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
<u>Petitioner,</u>

UNITED STEELWORKERS OF AMERICA,
AFL-CIO, CLC,

No. 97-1914

<u>Intervenor,</u>

v.

BANDAG, INCORPORATED,
<u>Respondent.</u>

On Application for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-17210)

Argued: January 26, 1998

Decided: April 13, 1998

Before MURNAGHAN, NIEMEYER, and MOTZ, Circuit Judges.

_____

Petition to enforce granted by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** William Parker Barrett, MAUPIN, TAYLOR & ELLIS,
P.A., Raleigh, North Carolina, for Bandag. John Emad Arbab,
NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Board. David E. Goldman, Assistant General Counsel, UNITED
STEELWORKERS OF AMERICA, Pittsburgh, Pennsylvania, for
Intervenor. **ON BRIEF:** Robert A. Valois, Michael C. Lord,

MAUPIN, TAYLOR & ELLIS, P.A., Raleigh, North Carolina, for Bandag. Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, Christopher W. Young, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

On the application of the National Labor Relations Board ("Board") to enforce its order requiring Bandag, Incorporated ("Bandag"), to bargain with Local 922 of the United Steelworkers of America, AFL-CIO, CLC ("Union"), Bandag contends that it need not bargain with the Union because the decertification election in which the Union prevailed was rendered invalid by various third-party threats and harassing acts that occurred during the period before the election. Because we conclude that the Board's decision to certify the Union was reasonable and supported by substantial evidence, we enforce the Board's order.

I

Bandag operates a tire retreading manufacturing facility in Oxford, North Carolina, and a related warehousing facility in Louisburg, North Carolina. Its production and maintenance employees have been represented by the Union and its predecessor since 1970.

On February 9, 1996, Jeff Daniel, a Bandag employee and member of the collective bargaining unit, filed a decertification petition with the Board alleging that a substantial number of Bandag employees no longer recognized the Union as their collective bargaining representa-

2

tive. The Board conducted an election on March 28, 1996, and out of 169 eligible voters, a total of 163 ballots were cast, including one void ballot, with the following results: 92 for continued representation by the Union, 67 against continued representation, and 3 which were challenged.

Bandag filed timely objections to the election, contending that the election had been undermined (1) by an "atmosphere of confusion, fear of reprisal, coercion and intimidation" created by two anonymous bomb threats received at Bandag's Oxford plant on March 27, 1996, and March 28, 1996; (2) by "numerous acts of intimidation and harassment engaged in by agents of the union and/or employees known to be pro-union"; and (3) by "numerous acts of sabotage and tampering with property, machinery and equipment of the Employer." The Regional Director convened a hearing on May 1-2, 1996, at which the following facts were developed.

Martha Tanner, wife of Plant Manager Marshall Tanner, received an anonymous telephone call shortly after midnight on March 27, 1996, two nights before the election, stating that Ms. Tanner should inform her husband that something was "set to go off at 3:30." Interpreting the call as a bomb threat, Ms. Tanner contacted her husband at Bandag's Oxford plant. Plant management decided to cease operations and evacuate the facility until representatives of the sheriff's and fire departments could search the plant. When it was determined that the plant was safe, plant operations resumed around 4:00 a.m. As day shift employees later reported to work, their supervisors advised them of the threat.

A second threat was received the following evening by a 911 dispatcher from an unidentified caller stating that a bomb was set to go off at Bandag's Oxford plant at 2:30 a.m. After deputy sheriffs informed management of the situation, management again decided to shut down operations and evacuate the facility until representatives of the sheriff's and fire departments conducted a search. After determining that the plant was safe, work resumed around 3:00 a.m. Again, day-shift employees were apprised of the threat. The Hearing Officer found that these threats "worried" and "concerned" the employees.

In addition to the bomb threats, the Hearing Officer found numerous incidents of intimidation and harassment directed against Jeff

3

Daniel, the employee who originally filed the decertification petition. The Hearing Officer determined that most of these incidents were instigated by Steve Harris, a pro-union employee. The first incident occurred on February 12, 1996, when Harris intentionally stood in Daniel's way while Daniel was carrying 100-pound rolls of heated rubber. The next day, Harris stared at Daniel for 3-5 minutes from a distance of about 25 feet. He stared at Daniel on other occasions, as well. The Hearing Officer also found that Harris had followed Daniel in his car as the two men drove home from work on February 19, 20, and 21.

During the period before the election, Daniel also received 23 anonymous telephone calls. Twenty-two of the calls involved laughing and heavy breathing, while one caller warned Daniel to "watch your back." Although a tracer was placed on Daniel's phone, no call lasted long enough for a trace to be completed. Also, on February 15, 1996, someone claiming to be Daniel's wife placed two calls to the plant while Daniel was at work. In the first call, the woman left a message for Daniel asking him to call home and saying that it was an emergency. After Daniel investigated the situation, he determined that his wife had not made the call and that there was no emergency. Later, the female caller spoke to Daniel's supervisor and warned him that Daniel had been home, had retrieved his gun, and was returning to the plant. Aware by this time that the caller was not Daniel's wife, the supervisor ignored her warning.

Two other anti-union employees also experienced incidents of intimidation and harassment in the weeks prior to the election. At the hearing, Steve Sizemore testified that immediately after the decertification petition was filed two pro-union employees warned him in a "confidential" and "concern[ed]" manner to "watch his back." Sizemore claimed that as a result of this encounter he was less willing to express his pro-company views openly, although he admitted that he never actually was threatened and that none of the events leading up to the election changed the way he voted. Richard Nott, a former Union member, testified that during the campaign he, like Daniel, received a number of anonymous telephone calls which interrupted his sleep until he purchased an answering machine and started unplugging his phone. Furthermore, on March 26, 1996, two days before the election, Nott's wife received a call from someone claim-

4

ing to be associated with Bandag and asking her for her opinion about the upcoming election. Nott's wife told the caller to "go to hell." Nott did not interpret the call as threatening.

At the hearing, Bandag witnesses testified about multiple suspicious incidents of plant and machinery sabotage that occurred during the period preceding the election. The incidents included machines being turned off improperly, temperature and air gauges being set too low, foreign material being thrown into machines, waste water discharge valves being closed intentionally, pipes being broken, and mixing churns being over-filled. The Hearing Officer found that, although the various incidents may have necessitated time-consuming cleaning and repair, they were "minor in nature," and "[t]here was no evidence presented as to who was responsible for the. . . alleged sabotage and tampering." Indeed, the Hearing Officer concluded with respect to all of the harassing conduct that "the evidence is insufficient to establish that the Union was responsible."

Following the hearing, the Hearing Officer concluded that even though the incidents had occurred, the election campaign "was not conducted in the face of a violent and emotion-filled strike," that it "did not involve extensive destruction of the Employer's property," that "the alleged threats or harassment were limited to two or three . . . employees [besides Daniel] and were clearly isolated, nonserious incidents," and that "considering that the campaign herein was not conducted against a backdrop of violence and destruction . . . the bomb threats were not aggravated conduct." Accordingly, he recommended that Bandag's objections to the election be overruled and that a certification of representative be issued. The Board adopted the Hearing Officer's findings and recommendations and certified the Union on August 27, 1996.

In response to Bandag's later refusal to bargain with the Union, the Regional Director filed a complaint, alleging that Bandag had violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 158(a)(1) and (5), by refusing to bargain. Bandag defended on the ground that the Union had been certified improperly. On December 6, 1996, the Board issued a decision and order finding that Bandag's refusal to bargain with the Union violated sec-

5

tions 8(a)(1) and (5) of the Act. The Board now seeks enforcement of its order.

II

If we conclude that the Board's decision is reasonable and based upon substantial evidence in the record considered as a whole, our inquiry ends. We may not substitute our judgment for that of the Board, even if we would have made a different decision had the matter been before us de novo. See 29 U.S.C. § 160(e); Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951). Moreover, the results of a Board-supervised representation election are presumptively valid. N.L.R.B. v. Columbia Cable T.V. Co., 856 F.2d 636, 638 (4th Cir. 1988). This presumption reflects Congress's decision to "entrust[ ] the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees." N.L.R.B. v. A.J. Tower Co., 329 U.S. 324, 330 (1946).

When pre-election conduct is alleged to have invalidated a representation election, the party seeking to overturn the election, in this case Bandag, bears the burden of proving by specific evidence not only that campaign improprieties occurred but also that they prevented a fair election. N.L.R.B. v. Hydrotherm, Inc., 824 F.2d 332, 334 (4th Cir. 1987). In evaluating such a challenge, less weight will be accorded the comments and conduct of third parties than those of the employer or union. N.L.R.B. v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290 (4th Cir. 1987). Thus, an election will be set aside for third-party conduct "only if `the election was held in a general atmosphere of confusion, violence, and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render impossible a rational uncoerced expression of choice as to bargaining representation.'" Id. (quoting Methodist Home v. N.L.R.B., 596 F.2d 1173, 1183 (4th Cir. 1979)). Factors relevant to this determination include the temporal proximity of the alleged misconduct to the election, and whether the election was won by a clear majority or by a close vote. Methodist Home, 596 F.2d at 1184. The touchstone always is whether the election was an accurate indicator of the employees' preferences. Finally, it must be remembered that representation elections are by their nature "heated affair[s]," Herbert

6

Halperin, 826 F.2d at 290, and that they must be assessed "in the light of realistic standards of human conduct," Case Farms of North Carolina, Inc. v. N.L.R.B., 128 F.3d 841, 844 (4th Cir. 1997) (citation omitted).

Bandag contends that the acts of harassment, sabotage, and bomb threats constituted "an uninterrupted and escalating campaign of coercion" that "created an atmosphere of fear and reprisal thereby precluding a free election." It argues, therefore, that under the third-party standard for objectionable conduct, the Board's decision to certify the Union is not supported by substantial evidence and must be reversed. The Board argues in response that "the anonymous and third-party conduct fell within the realm of preelection mischief insufficient to render employees' free choice impossible" and that its decision to overrule Bandag's objections and certify the Union was reasonable.

While we acknowledge that the conduct of which Bandag complains was offensive and disruptive, Bandag has not demonstrated that the employees' ability to cast a free and rational vote was undermined. Over 96% of eligible employees voted in the election, and, despite the threats made against three pro-company employees, a full 41% of voters opposed continued representation by the Union. Moreover, not one employee testified before the Hearing Officer that he or she changed his or her vote in response to any of the incidents that occurred during the pre-election period. We believe that Bandag has not met its "heavy burden," see Herbert Halperin, 826 F.2d at 290, of proving that the alleged misconduct sufficiently affected the accuracy of the election.

Because we conclude that the Board's decision to affirm the election was not unreasonable, Bandag has a duty to bargain with the Union. The Board's petition to enforce is therefore granted.

PETITION TO ENFORCE GRANTED

7