**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

—————————

**No. 06-1434**

—————————

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

versus

STANDARD REGISTER COMPANY,

Respondent,

and

GRAPHIC COMMUNICATIONS INTERNATIONAL UNION,
LOCAL 582-M,

Intervenor.

—————————

On Application for Enforcement of an Order of the National Labor
Relations Board.  (5-CA-32798)

—————————

Argued:  February 1, 2007            Decided:  May 2, 2007

—————————

Before WILKINSON, WILLIAMS, and MICHAEL, Circuit Judges.

—————————

Order enforced by unpublished per curiam opinion.

—————————

**ARGUED:** Arnold Edwin Perl, FORD & HARRISON, L.L.P., Memphis,
Tennessee, for Respondent.  Jeffrey James Barham, NATIONAL LABOR
RELATIONS BOARD, Office of the General Counsel, Washington, D.C.,
for the Board.  Daniel B. Smith, O'DONNELL, SCHWARTZ & ANDERSON,
P.C., Washington, D.C., for Intervenor.  **ON BRIEF:** C. Mark

Kingseed, Mary L. Wiseman, COOLIDGE WALL CO., L.P.A., Dayton, Ohio, for Respondent. Ronald Meisburg, General Counsel, John E. Higgins, Jr., Deputy General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Julie Broido, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Office of the General Counsel, Washington, D.C., for the Board.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

The National Labor Relations Board has applied for enforcement of its order requiring Standard Register Company to bargain with the Graphic Communications Conference, International Brotherhood of Teamsters, Local 582-M, CLC (the "Union"). Standard Register contends that it should not be required to bargain with the Union because the certification election in which the Union narrowly prevailed was invalid. For the following reasons, we agree with the Board's decision to certify the election and we grant the Board's application for enforcement of its order.

I.

On May 2, 2005, the Union filed a petition with the NLRB requesting that the Board hold a representation election for the production and maintenance employees of Standard Register's Salisbury, Maryland print shop. The Union won the election, held on June 10, 2005, by a vote of 59 to 57. Standard Register thereafter filed objections to the election, contending that the Union "unlawfully interfered with the rights of the employees of Standard Register to exercise their right to choose whether or not to be represented by a labor organization." (J.A. at 111.)[1] More specifically, Standard Register alleged that a pro-Union employee,

[1]Citations in this opinion to "(J.A. at ___.)" refer to the contents of the Joint Appendix filed by the parties in this appeal.

3

Walter Scott, engaged in racial and national origin harassment of Viet Ly, an employee of Vietnamese origin, to intimidate Ly into supporting the Union. Standard Register also alleged that pro-Union employee Harry Thornton made economic threats against employee Sandy Adkins, telling her that if she did not sign a Union authorization card she would have to pay $100 if the Union won the election.

On July 19, 2005, an administrative law judge (ALJ) held a hearing on Standard Register's objections. Ly testified that, on the day of the election, Scott became angry when Ly refused to reveal how he planned to vote. Playing off a nettlesome comment that Scott had previously made to Ly, Scott told Ly, who had served in the South Vietnamese army, that he was "act[ing] like a VC," which stands for Viet Cong, the guerrilla forces that fought against the United States and South Vietnamese government. (J.A. at 73.) Another employee, who observed but did not hear Scott speaking to Ly, testified that Ly appeared "extremely upset" after the encounter and asked, "Why Walt talk so crazy?" (J.A. at 75.)

Scott also testified and admitted to confronting Ly on the day of the election about a rumor that Ly was no longer supporting the Union. According to Scott, he asked Ly "if he was wussing out."[2] (J.A. at 84.) Scott then told Ly that he was "nothing but a wuss"

---

[2] "Wuss" means "wimp." Merriam-Webster's Collegiate Dictionary 1448 (11th ed. 2004).

4

and that was "why [his] country is Communist." (J.A. at 84.) Scott also testified that for many years he would "once in a while . . . call [Ly] 'VC,' just to get him going." (J.A. at 87.)

With regard to the allegations of economic threats, Sandy Adkins testified that three or four weeks before the election Harry Thornton, a pro-Union employee, told her that "if [she] didn't go to a [Union] meeting to get a[n authorization] card and sign it, [she would] have to pay a $100 fine." (J.A. at 63.) At a later date, Thornton offered to get Adkins an authorization card. Thornton, however, never gave Adkins an authorization card, and she never observed him with an authorization card. In fact, Adkins never signed an authorization card.

Patrick O'Hare, the local president of the Union, testified that although the Union had a plant committee of employees to assist in furthering the Union's message, Walter Scott and Harry Thornton were not on the committee. According to O'Hare, the Union told employees at a meeting that the Union would waive initiation fees and had also sent a leaflet to all employees informing them that they would never have to pay initiation fees or fines to the Union. Henry Rumph, a professional organizer for the Union, testified that Scott and Thornton were not leaders of the pro-Union employees. Rumph also testified that he did not give authorization cards to Thornton.

Considering this evidence, the ALJ denied Standard Register's objections to the election. Regarding the comments made by Thornton to Adkins, the ALJ concluded "that Thornton did not engage in conduct that could be attributed to the Union, and that his statements to Adkins did not constitute objectionable conduct." (J.A. at 163.) Moreover, the ALJ concluded that Thornton's statements to Adkins about the initiation fees were cured by the Union's pronouncements at meetings that the Union would waive initiation fees and the flyer mailed to employees "guarantee[ing]" that they would not have to pay fees. (J.A. at 163.)

The ALJ also concluded that Scott's inflammatory remarks did not require setting aside the election. The ALJ concluded that Scott, although a union supporter, "had no other special ties to the Union to give him actual or apparent authority to speak on the Union's behalf." (J.A. at 165-66.) The ALJ observed that "Scott's remarks were isolated . . . and did not attribute any racially related views or conduct to either the Employer or the Union." (J.A. at 166.) The ALJ found it "unlikely" that Scott's remarks impacted Ly's vote and also found that the remarks did not "obfuscate the true campaign issues for Ly or any other voter." (J.A. at 166.)

The Board affirmed the ALJ's findings and conclusions, although with slight modifications. Because the Board agreed with the ALJ that "Thornton, who made the allegedly objectionable

6

statement [about the initiation fees], was not a special agent of the Union," the Board found "it unnecessary to rely on the [ALJ's] alternative finding that the Union cured any otherwise objectionable statements by Thornton." (J.A. at 212.) In reference to Scott's remarks to Ly, the Board found it unnecessary to rely on the distinction drawn by the ALJ between improper racial appeals made by a Union or Employer and improper appeals made by a third-party, because "even when analyzed under the stricter party standard . . . , employee Walter Scott's isolated remark to coworker Viet Ly would be insufficient to warrant a new election." (J.A. at 212.)

In order to obtain court review of the Union's certification, Standard Register refused to bargain with the Union. See NLRB v. Ky.-Tenn. Clay Co., 295 F.3d 436, 441 n.2 (4th Cir. 2002) ("[B]ecause an employer cannot obtain direct review of a Board's certification, a refusal to bargain is the proper path to judicial review of the Board's election decision."). Thereafter, the Union filed an unfair labor practice charge with the Board. The Board granted the NLRB General Counsel's motion for summary judgment and ordered Standard Register to bargain with the Union. Pursuant to 29 U.S.C.A. § 160(e) (West 1998), the Board petitioned this court for enforcement of its order.

"The results of a NLRB-supervised representative election are presumptively valid, and we must uphold findings and conclusions of the Board so long as the decision is reasonable and based upon substantial evidence in the record considered as a whole." Ky.-Tenn. Clay Co., 295 F.3d at 441 (internal quotation marks, citations, and alterations omitted).

The Board strives to conduct representative elections "in 'laboratory conditions,' free from behavior that improperly influences the outcome," id., but "in reality these conditions are often less-than-perfect . . . [because] [a]n election by its nature is a heated affair," NLRB v. Herbert Halperin Distrib. Corp., 826 F.2d 287, 290 (4th Cir. 1987). "Coercive conduct is never condoned during the election process, but the Board will not set aside an election unless an atmosphere of fear and coercion rendered free choice impossible." Id.

"In determining whether improper behavior has materially influenced the outcome of an election, the source of the behavior is an important consideration." Ky.-Tenn. Clay Co., 295 F.3d at 441. Because "third parties are not subject to the deterrent of having an election set aside, and third party statements do not have the institutional force of statements made by the employer or the union," Herbert Halperin, 826 F.2d at 290, "[l]ess weight is

accorded the comments and conduct of third parties than to those of the employer or union," id.

There are, therefore, two standards for evaluating improper conduct in the course of a representative election. If the improper conduct was committed by a party to the election, i.e., the employer or the union, there must be specific evidence "that improprieties occurred . . . [and] that they materially affected the election results." Id. If, however, the improper conduct was committed by a third party, the election will be set aside "only if the election was held in a general atmosphere of confusion, violence, and threats of violence, such as might reasonably be expected to generate anxiety and fear of reprisal, to render impossible a rational uncoerced expression of choice as to bargaining representation." Id. (internal quotation marks omitted).

We evaluate appeals to racial sentiments in representative elections using the standard the Board established in Sewell Mfg. Co., 138 N.L.R.B. 66, 70 (1962). In that case, the Board stated "that 'a deliberate, sustained appeal to racial prejudice' could create conditions that 'ma[ke] impossible a reasoned choice of a bargaining representative.'" Case Farms of N.C., Inc. v. NLRB, 128 F.3d 841, 845 (4th Cir. 1997). Thus, a new election would be required if "[t]he [racial] remarks . . . suggest an atmosphere inflamed by racial tension . . . or represent a deliberate attempt

9

by the union to divert the employees from legitimate issues by insinuating an irrelevant appeal to race." Herbert Halperin, 826 F.2d at 293.

1.

While we do not condone Scott's behavior, his mean slur against Ly does not warrant invalidating the election.[3] "[A]ppeals to race or ethnicity must be 'inflammatory' in order to violate the Sewell standard." Case Farms, 128 F.3d at 845. "[A]ppeals to the racial or ethnic prejudices of the workers themselves, often in the form of slurs or insults" against the employer or employer's management, have been held to be inflammatory, as have "[a]ttempts to portray an employer as bigoted." Id. at 846. Scott's remarks fall in neither category. Scott did not, for example, refer to Standard Register as "Viet Cong" to prod Ly toward voting for the Union. Cf. M & M Supermarkets, Inc., v. NLRB, 818 F.2d 1567, 1569, 1573 (11th Cir. 1987) (concluding that an employee's comments that "[u]s blacks were out in the cotton field while they, the damned

_____

[3]We reject Standard Register's contention that the Board erred by analyzing Scott's remarks according to the standard of conduct that applies to parties to the election. Simply put, the Board was giving Standard Register the benefit of the doubt in determining which standard applies. If a new election is not required when Scott's remarks are analyzed under the standard governing parties to the election, a new election most assuredly will not be required when the remarks are analyzed under the more lenient standard that applies to third party conduct. We expect better behavior by parties to the election, and we will be more inclined to require a new election when the parties misbehave than when third parties misbehave.

10

Jews, took their money from the poor hardworking people . . . inflamed racial and religious tensions against the Jewish owners of the company and destroyed the laboratory conditions necessary for a free and open election").  Neither did Scott portray Standard Register as bigoted against people of Vietnamese origin.  Cf. KI (USA) Corp. v. NLRB, 35 F.3d 256, 257 & n.1 (6th Cir. 1994) (setting aside a representation election at a Japanese-owned company in which a union flier reproduced comments of a Japanese businessman calling American workers "lazy, uneducated . . . [and] half-witted" and implying that the businessman's comments reflected the views of the company's management).

Elections often stir up strong feelings, and union representation elections are no different.  Given the frequently heated nature of elections, it is foreseeable that individuals supporting one side may ignore civility and make offensive or hateful comments against an individual supporting the opposing side.  See Herbert Halperin, 826 F.d at 292 ("[W]e think that it is unrealistic to expect every election dialogue to be completely sanitized.").  While the use of offensive language is not to be condoned, we will not require a new election unless the language amounts to "an inflammatory appeal to racial or ethnic sentiment." Case Farms, 128 F.3d at 845.  Scott's remark was certainly insulting, but it did not rise to the level of being an

11

inflammatory appeal to ethnic sentiment. We therefore agree with the Board that Scott's remark does not warrant a new election.

2.

Standard Register also contends that the election results should be invalidated because of Harry Thornton's statements to Sandy Adkins that she would have to pay $100 if she did not sign a union authorization card. In NLRB v. Savair Mfg. Co., 414 U.S. 270 (1973), the Supreme Court held that a union could not condition a waiver of the union initiation fee on an employee signing a union authorization card because such conduct "allows the union to buy endorsements and paint a false portrait of employee support during its election campaign." Id. at 277.

For the Union to have violated Savair and a new election to be required, however, Thornton's remarks must be attributable to the Union. Standard Register contends that Thornton's remarks are attributable to the Union because he was a special agent of the Union for the purpose of soliciting authorization cards, making the Union responsible for his statements.

The Board has stated that "[w]hen a union makes authorization cards available to employees with the understanding that they will solicit other employees to sign them, it thereby vests the solicitors with actual authority to obtain signed cards on its behalf." Davlan Eng'g, 283 NLRB 803, 804 (1987). Accordingly, the Board deems "employees who solicit authorization cards . . .

12

special agents of the union for the limited purpose of assessing the impact of statements about union fee waivers or other purported union policies that they make in the course of soliciting." Id.; see also NLRB v. Georgetown Dress Corp., 537 F.2d 1239, 1244 (4th Cir. 1976) (concluding that under principles of agency law the union was responsible for the misdeeds of employees that volunteered to, among other things, solicit other employees to sign authorization cards).

Standard Register acknowledges that "there is no evidence that the Union specifically gave authorization cards to Mr. Thornton or directed him to solicit authorization cards from fellow employees." (Appellant's Br. at 27.) Nevertheless, Standard Register contends that the Union should be held responsible for Thornton's comments because the Union gave authorization cards to certain employees without specifically instructing those employees not to involve other employees like Thornton.

Substantial evidence supports the Board's conclusion that Thornton's comments are not attributable to the Union and that the Union therefore did not run afoul of Savair. According to Adkins, Thornton told her that "if [she] didn't go to a meeting to get a[n authorization] card and sign it, [she would] have to pay a $100 fine, or $100 to get it plus a fine, possibly." (J.A. at 63.) But it was not until a later date that Thornton offered to get Adkins an authorization card. And despite Thornton's offer, Adkins stated

13

that she never saw Thornton with an authorization card. These facts provided sufficient evidence for the ALJ to find that "Thornton merely announced a vague policy to Adkins at a time that he did not ask her to sign a card" and that because his "pronouncement was not made in the act of soliciting Adkins' signature, . . . he never achieved special agent status." (J.A. at 163.)

Furthermore, Thornton's statements to Adkins do not require a new election because Adkins never signed an authorization card. The Court in Savair had two main concerns: (1) unions would "buy" endorsements through fee waivers and then use those endorsements as a "campaign tool . . . to convince other employees to vote for the union, if only because many employees respect their coworkers' views on the unionization issue"; and (2) an employee who endorsed the union by signing an authorization card "would feel obliged to carry through on their stated intention to support the union" by voting for the union in the election. 414 U.S. 277-78. Those concerns are not implicated here. Because Adkins never signed an authorization card, her endorsement was not purchased, and there was no false portrait painted that she supported the union. Nor would she have felt obliged to vote for the Union. See Dyna-Fab, Corp., 270 N.L.R.B. 394 (1984) ("In the case where . . . [a] waiver of initiation fees did not result in the execution of any authorization cards or membership applications, no endorsements

14

were purchased and no false portrait of employee support could have been painted.  Nor would any employees have felt morally impelled to vote for the [union] based on a benefit extended by the [u]nion in connection with signing a card or joining.").  We therefore agree with the Board that Thornton's comments to Adkins do not require a new election.

III.

Because Scott's epithet against Ly and Thornton's comments to Adkins on fee waivers are not misconduct requiring a new election, we conclude that substantial evidence supports the Board's decision to certify the Union as the collective bargaining representative. We therefore grant the Board's application for enforcement of its order.

ORDER ENFORCED

15