DID BUILDING SERVICES,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

DID BUILDING SERVICES,
INC., Respondent.

Nos. 88–7519, 89–70113.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 7, 1990.

Decided Sept. 26, 1990.

Scott A. Wilson, Jody A. Landry, Littler, Mendelson, Fastiff & Tichy, San Diego, Cal., for petitioner, Did Bldg. Services.

Christopher W. Young, N.L.R.B., Washington, D.C., for respondent, N.L.R.B.

Before THOMPSON and TROTT, Circuit Judges, and GRAY,* District Judge.

TROTT, Circuit Judge.

## SUMMARY

Petitioner Did Building Services, Inc. ("Company") appeals from respondent National Labor Relations Board's ("Board") decision that petitioner violated section 8(a)(1) and (5) of the National Labor Relations Act ("Act"), 29 U.S.C. §§ 151–168 (1988), by refusing to bargain with and provide information to the Service Employees International Union, Local No. 102, AFL–CIO ("Union"), and from respondent's order requiring petitioner to bargain and furnish information. Respondent cross-appeals for enforcement of the order. We have jurisdiction under 29 U.S.C. § 160(e) and (f), and we affirm.

## BACKGROUND

On September 17, 1987, the Union won a representation election among petitioner's janitorial employees by a vote of eleven to six with three challenged ballots.

The Company filed objections to the election alleging that, during the campaign, the Union's agents and/or supporters: (1) used racial and religious slurs in describing the Company's owner, Carmine DiDomenico; and (2) promised to waive initiation fees of employees who signed Union authorization cards.

Testimony at the hearing with respect to racial and religious remarks was as follows.

Supervisor Carlos Violanti testified that, during a heated discussion with employee Jose Luis Contreras, the latter

said that the Union was supporting the Mexicans, that the Mexicans should get together and that the Union would protect them against gringos and Jews, that those people never do anything for the workers, and that the Union is for the poor people and for the Mexicans....[1]

[H]e [Contreras] said that he [DiDomenico] didn't care about the employees, that he was a Jew, that he had zillions of dollars and he's like all the other gringos who doesn't give a damn about the poor Mexicans.

Violanti said he tried to defend the owner but Contreras continued to repeat that the Union would protect the workers against the owner. Violanti stated that their discussion occurred in front of three other employees about two weeks before the election. Violanti said he also overheard Contreras in conversations with two other employees shortly before the election refer to the owner as a Jew and say that the Union protects the Mexicans against "gringos and Jews." Violanti characterized

---

* The Honorable William P. Gray, Senior United States District Judge, Central District of California, sitting by designation.

1. Violanti testified that although he did not know how many employees were of Mexican descent, all speak Spanish. ER 11.

Contreras as an outspoken Union supporter.

Employee Gloria Romero testified that after Company-sponsored meetings, Contreras always loudly told other employees that we should unite, that we should join the Union and we should not be on the owner's side, who was a Jew who was exploiting us. She said Contreras habitually referred to the owner as a Jew.

Employee Monica Becerra, Romero's daughter, testified that, shortly before the election, Contreras solicited her signature on a Union authorization card and, in reply to her question as to what benefits would result, said that "the Jewish gringos were exploiting us." She said she attended the Company meetings but never heard Contreras make the loud remarks attributed to him by Romero.

Contreras admitted having engaged with Violanti in the conversation described, but denied ever having referred to DiDomenico as a Jew or gringo. Employee Jose Luis Trujillo testified that he was present at the conversation between Contreras and Violanti and attended all the Company meetings but did not hear Contreras refer to the owner as a Jew or gringo at any of these times.

Testimony with respect to promises to waive initiation fees was as follows.

Becerra testified that Contreras promised to waive her initiation fees if she signed a card, and told her to convey the same offer to Romero and another employee, which she said she did. Contreras denied these allegations.

Romero testified that employee Luis Ernesto, her son, told her that Eliseo Medina, the local union president, had promised in front of another employee to waive his initiation fee if he signed a card. Romero said her conversation with Ernesto occurred in front of many other employees. Medina denied the conversation with Ernesto.

Romero also testified that: (1) she considered Contreras a Union representative because employees attending meetings during the campaign would have him ask their questions; and (2) employees brought work problems to Contreras for presentation in an unofficial capacity to the Company. Neither of the two employees whom she claims brought problems to Contreras testified.

As to the alleged slurs by Contreras, the hearing officer credited Violanti's over Contreras's version of their conversation and concluded that therefore Contreras on that occasion referred to the owner as a Jew and gringo in front of three other employees. He discredited Violanti's testimony that he overheard Contreras make similar comments in other conversations on the grounds that: (1) Violanti's recollection was slow to develop and devoid of specificity; and (2) the Company failed to call as witnesses the two employees to whom Contreras supposedly addressed these remarks.

The hearing officer discredited Romero's testimony that Contreras made similar comments after Company meetings on the grounds that: (1) Contreras and Trujillo denied her allegations; (2) her daughter, Becerra, did not hear the comments; and (3) Romero's demeanor in testifying was "less than candid" in that she appeared to seek to please her employer and exaggerate her replies, and often responded with broad, general answers.

The hearing officer discredited Becerra's claim that Contreras, in soliciting her signature on a card, referred to the owner as a Jew and said the Jewish gringos were exploiting the workers, on the grounds that: (1) although she claimed to have related the conversation to her mother and another employee, the Company did not present either's testimony in this regard; (2) her testimony and earlier affidavit were inconsistent as to whether Contreras had actually given her a card; and (3) her demeanor was unconvincing in that "she appeared too eager to state her accusations and tended to provide overly broad and generalized responses."

The hearing officer recommended overruling the objection based on Contreras's slurs because they "could [not] have im-

paired the employees' freedom of choice in the subsequent election." He reasoned that: (1) Contreras was neither a Union agent nor a person in any special position of influence over the other employees; (2) no one could have reasonably attributed his statements to the Union; and (3) the campaign was neither heated nor laced with threats or violence, and; (4) as Contreras uttered the slurs in a heated discussion, "it is reasonable to conclude that the other employees listening ... took them to reflect Contreras's personal biases."

As to the allegations of promises of fee waivers, the hearing officer credited Contreras over Becerra because: (1) Becerra's testimony and affidavit were inconsistent; (2) Becerra's demeanor was unconvincing; and (3) Contreras testified in a sincere, forthright manner as to their conversation. The hearing officer credited Medina over Romero on the bases of: (1) their demeanors; (2) the Company's failure to present corroborating testimony of employees who supposedly witnessed the conversations; (3) inconsistencies in Romero's testimony (she initially said she overheard the alleged conversation between Medina and Ernesto and then reported its substance, but then testified that she did not actually know the substance until Ernesto described it); and (4) her tendency to exaggerate her testimony. Accordingly, he recommended overruling the objection based on alleged promises to waive fees on the ground that no such promises were made.

In its Decision and Certification of Representative, the Board adopted the hearing officer's findings and recommendations and certified the Union. In particular, the Board upheld the hearing officer's credibility findings pursuant to its "established policy not to overrule a hearing officer's credibility resolutions unless the clear preponderance of all the relevant evidence convinces us they are incorrect." As to Contreras's religious and racial remarks, the Board stated:

[T]he comments made by employee Contreras are troubling and we certainly do not condone the use of such terms occurring in the context of a Board conducted election. However, here the evidence as credited by the Hearing Officer establishes that the comments were made on a single occasion by a pro-union employee in a manner that could not reasonably create the appearance that his remarks represented the views of the Union; and there is no evidence that the Union had notice that he had made such remarks, so its failure to repudiate them has no significance. Under these circumstances, we find no basis for setting aside the election under rule [sic] of *Sewell Manufacturing Co.*, 138 N.L.R.B. 66 (1962).

Accordingly, the Board, in its Decision and Order on summary judgment, held that the Company had violated the Act by refusing to bargain and to provide information to the Union, and ordered the Company to bargain and provide the relevant requested information. The Company appeals from this Decision and Order.[2]

### STANDARD OF REVIEW

We conduct a limited review of the Board's finding that conduct does not warrant setting aside an election. *NLRB v. Cal-Western Transport*, 870 F.2d 1481, 1483 (9th Cir.1989). The Board has broad discretion to determine the propriety of the election process. *Id.* "'Congress has entrusted the Board with a wide degree of discretion in establishing the procedure and safeguards necessary to insure the fair and free choice of bargaining representatives by employees.'" *Id.* at 1483–84 (quoting *NLRB v. A.J. Tower Co.*, 329 U.S. 324, 67 S.Ct. 324, 91 L.Ed. 322 (1946)). Accordingly, the party challenging the election bears the heavy burden of proving that misconduct prevented a fair election. *NLRB v. Sauk Valley Mfg. Co.*, 486 F.2d 1127, 1130

**2.** In addition to the arguments addressed in our Discussion, petitioner argues that the Board erred in finding its refusal to provide employee Social Security numbers to the Union violated the Act. Respondent contends that this argu-

ment is meritless because the finding also rested on withholding of other information that petitioner does not seek to legitimize. Petitioner does not rebut this contention in its Reply Brief, and therefore apparently concedes the point.

(9th Cir.1973). We will not overturn the Board's decision to certify a union unless the Board abused its discretion. *Cal–Western*, 870 F.2d at 1484. We will enforce a decision of the Board if it correctly applied the law and its fact findings are supported by substantial evidence. *Id.* We consider the record as a whole, including whatever contradicts the findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1076 (9th Cir.1977); 29 U.S.C. § 160(e)-(f). We defer to the Board's reasonable interpretation and application of the Act. *NLRB v. Howard Elec. Co.*, 873 F.2d 1287, 1290 (9th Cir.1989).

## DISCUSSION

We must determine whether substantial evidence supports the Board's findings that: (1) only the one incident of slurs and none of fee waiver promises were credible; (2) Contreras was not a Union agent; and (3) the credited incident did not so taint the election as to require its invalidation.[3] We must also determine whether the Board correctly interpreted applicable law in reaching the latter two findings.

## I

### Credibility findings

Petitioner contends that the finding crediting only the one incident of slurs and

---

**3.** The Board's finding that misconduct does not so taint an election as to require invalidation is one of fact. *See Cal–Western*, 870 F.2d at 1484 (addressing whether substantial evidence supports finding that supervisor's participation in campaign had coercive effect on employees); *NLRB v. Heavy Lift Serv., Inc.*, 607 F.2d 1121, 1123 (5th Cir.1979) (addressing whether substantial evidence supports finding that election not "fatally injected" with racial prejudice). *But cf. M & M Supermarkets, Inc. v. N.L.R.B.*, 818 F.2d 1567, 1573 (11th Cir.1987) (issue whether employer made prima facie showing that anti-semitic remarks destroyed election atmosphere and thus warranted election invalidation is question of law); *N.L.R.B. v. Claxton Mfg. Co.*, 613 F.2d 1364, 1365 (5th Cir.1980) (issue of whether employer made prima facie showing that threats warranted election invalidation is one of law).

**4.** Petitioner cites *Penasquitos Village* for the proposition that we distinguish between so-

none of fee waiver promises is not supported by substantial evidence. We disagree.

■ We will not disturb a hearing officer's credibility determinations adopted by the Board "unless a clear preponderance of all the relevant evidence convinces that they are incorrect." *NLRB v. Luisi Truck Lines*, 384 F.2d 842, 846 (9th Cir.1967) (quoted by *NLRB v. Pacific Int'l Rice Mills, Inc.*, 594 F.2d 1323, 1326 (9th Cir.), *cert. denied*, 444 U.S. 898 (1979)); *NLRB v. Longshoremen's & Warehousemen's Union*, 514 F.2d 481, 483 (9th Cir.1975). We give special weight to a hearing officer's credibility findings based on demeanor. *Penasquitos Village*, 565 F.2d at 1079.[4]

■ As a threshold matter, petitioner argues that the Board's use of the clear preponderance standard in affirming the credibility finding not based on demeanor (i.e., the finding discrediting Violanti's testimony regarding slurs by Contreras other than the credited incident) requires either remand for the Board's de novo review or our de novo review. We disagree. The cases cited by petitioner *permit*, but do not *require* the Board independently to analyze the record in reviewing credibility findings not based on demeanor. *See SCA Servs. of Georgia, Inc.*, 275 N.L.R.B. 830, 832 (1985) (emphasis added) ("[W]hen an administrative law judge bases his credibility resolu-

---

called "testimonial inferences," i.e., credibility findings based on demeanor, and "derivative inferences," i.e., inferences drawn from the evidence itself, *id.* at 1078, and defer only to the former. The case does not support this. In *Penasquitos Village*, we discussed the relative weight to be given the administrative law judge's and Board's findings *where the two disagree*, not, as here, where the board adopts the hearing officer's findings. We emphasized our main point: "[T]he special deference deservedly afforded the administrative law judge's factual determinations based on testimonial inferences will weigh heavily in our review of a contrary finding by the Board." *Id.* Thus, although we assign special weight to the hearing officer's demeanor-based credibility findings, we always review the Board's findings under the deferential substantial evidence standard. *See id.* at 1076.

tions on factors other than his observations of the witnesses' demeanor, we *may* independently evaluate the witnesses' credibility."); *B.J. & R. Machine & Gear Co.,* 270 N.L.R.B. 267, 268 (1984).

■ Substantial evidence supports the credibility findings, as follows.

Substantial evidence discredits Violanti's testimony that he overheard Contreras utter slurs during conversations with two other employees. Most compelling is the absence of corroborating testimony by these two (or any of the others who allegedly heard the conversations). We recognize that bases for crediting Violanti exist. It seems plausible that, if Contreras uttered slurs in the credited incident, he did so at other times. The lack of specificity in Violanti's testimony cited by the hearing officer is not especially troubling; Violanti understandably recalled conversations he overheard in less detail than the one in which he participated, and recalled only the anti-Semitic, anti-gringo theme, given Violanti's claim that he repeatedly overheard Contreras pursue it in numerous discussions with co-workers. Respondent makes too much of Violanti's statement, " 'I can't really be sure. I can't remember—.' " In context, Violanti said he was certain he had overheard conversations between Contreras, Armenta, and Dominguez, but could not recall names of other witnesses to the conversations. Still, we defer to the hearing officer's credibility findings adopted by the Board (including those based solely on derivative inferences), and we find that the preponderance of evidence does not convince us that this credibility finding is incorrect.

Substantial evidence discredits Romero's testimony that Contreras loudly repeated the slurs in front of many employees after Company meetings. The hearing officer based this finding in part on Romero's demeanor, so it merits special weight. The Company offered no corroborating testimony of the many employees allegedly present. Both Trujillo and Romero's daughter, Becerra, testified that they were present but did not hear the alleged remarks.

The preponderance of evidence does not oppose the finding discrediting Becerra's testimony that Contreras uttered slurs in soliciting her signature. The hearing officer found her demeanor unconvincing as she seemed eager to accuse Contreras and provided broad responses. Her testimony and affidavit disagreed as to whether Contreras actually gave her a card.

Strong evidence supports the credibility of Medina's testimony (denying that he promised Ernesto that the Union would waive his initiation fee if he signed a card) over Romero's testimony (that Ernesto told her that Medina made this promise). The hearing officer cited Medina's and Romero's respective demeanors. The Company failed to call Ernesto, Romero's son, to corroborate her testimony. Romero's testimony constituted hearsay. Inconsistencies existed in her testimony. For example, after initially testifying that she overheard the conversation, she later testified that she did not know its content until told by Ernesto.

The preponderance of evidence does not oppose the finding crediting Contreras's denial over Becerra's testimony that Contreras promised to waive initiation fees. The hearing officer cited their relative demeanors. As noted earlier, her testimony and deposition were somewhat inconsistent.

Substantial evidence supports the implicit finding discrediting Romero's testimony that employees perceived Contreras as their representative to the Company because no corroborating testimony was presented.

The preponderance of evidence does not convince us that the credibility resolutions are incorrect. Accordingly, we proceed to decide the effect of the single credited appeal to prejudice.

## II

### Non-agency finding

Petitioner contends that: (1) the hearing officer and Board misinterpreted and misapplied the law in finding that Contreras was not an agent of the Union; and (2)

Contreras was either an agent or apparent agent of the Union. We disagree.

We generally review a finding as to agency status as a question of fact. *Dogherra v. Safeway Stores, Inc.*, 679 F.2d 1293, 1295 (9th Cir.) (en banc), *cert. denied*, 459 U.S. 990, 103 S.Ct. 346, 74 L.Ed.2d 386 (1982). We review the Board's interpretation of the law of agency as a question of law.

■ Under the Act, " 'the Union's responsibility for acts by its officers and members is controlled by common law agency principles.' " *May Dept. Stores Co. v. NLRB*, 707 F.2d 430, 433 (9th Cir.1983) (quoting *NLRB v. Advanced Systems, Inc.*, 681 F.2d 570, 576 (9th Cir.1982)).[5]

■ Petitioner disputes the hearing officer's interpretation and application of *Davlan Engineering, Inc.*, 283 N.L.R.B. 803 (1987), and *Bristol Textile Co.*, 277 N.L.R.B. 1637 (1986), in urging that Contreras was the Union's agent or apparent agent when he uttered the slurs. We agree with the hearing officer's interpretation and application of these cases.

In *Davlan*, the Board held the union accountable for improper representations regarding fee waiver policies made by four employees in the course of soliciting authorization cards.[6] The Board stated that, absent extraordinary circumstances, employees who solicit authorization cards are union special agents "for the limited purpose of assessing the impact of statements about union fee waivers or other purported union policies that they make *in the course of soliciting.*" *Id.* at 804 (emphasis added).

Petitioner urges that *Davlan* renders an employee who solicits cards an agent of the union for all purposes. We agree with the hearing officer that, under *Davlan*, comments of an employee who solicits cards are attributable to a union only insofar as the comments relate to the solicitation. Accordingly, the hearing officer correctly found *Davlan* inapposite. No evidence suggests that Contreras made the remarks at issue in the context of his effort to solicit cards.

In *Bristol Textile*, the Board held that an employee was a union's general agent because the union used him as its conduit to employees, even though the union neither officially designated him its representative nor paid him. A union official testified that the employee was "my contact" and other employees' "spokesman," was the union's sole link to employees, and regularly reported to him as to the campaign at his request. The employee confirmed that employees recognized him as the union's representative. No union official had access to the plant. We agree with the hearing officer that *Bristol* is distinguishable. No evidence suggests that the Union used Contreras as its conduit to employees. Testimony indicated that, although he was a vocal union supporter, only Romero perceived him as the employees' representative to the Company and Union. The Union never requested that Contreras serve as its link to employees. Official Union representatives conducted meetings for employees and directly answered their questions.

The facts are analogous to those in *NLRB v. Heavy Lift Serv., Inc.*, 607 F.2d

---

**5.** The Restatement (Second) of Agency §§ 1, 26, and 27 (1958) (quoted by *id.* at 433 n. 2) provides:

Section 1: (Definition of Agency)
(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act.
Section 26: (Creation of Authority)
[A]uthority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.

Section 27: (Creation of Apparent Authority)
[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him.
*Davlan Eng'g, Inc.*, 283 N.L.R.B. 803 (1986), and *Bristol Textile Co.*, 277 N.L.R.B. 803 (1987), addressed in our Discussion, reflect these principles.

**6.** Such a representation by a union violates *NLRB v. Savair Mfg. Co.*, 414 U.S. 270, 94 S.Ct. 495, 38 L.Ed.2d 495 (1973).

1121 (5th Cir.1979), *cert. denied,* 449 U.S. 822, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980). There, the Fifth Circuit held that evidence supported the Board's finding that an employee, in making racial slurs, was neither a union agent nor authorized to speak for the union. The employee had never held union office and had attended few union meetings, and the union did not condone the slurs. Similarly here, despite Contreras's vigorous support for the Union, he participated in its campaign only to a limited degree; he attempted to solicit only three signed cards and never obtained even one. Also, the Union never condoned Contreras's abhorrent comments. Indeed, no evidence suggests the Union even knew of them.

The hearing officer correctly interpreted and applied the law in finding that Contreras was not acting as the Union's agent when he uttered the credited slurs. Contreras was not the Union's agent, except perhaps for the limited purpose of obtaining card signatures, and lacked apparent authority to represent the Union. Thus, the slurs are not attributable to the Union.

### III

### Effect of appeal to prejudice

█ Petitioner contends that the Board's finding that Contreras's remarks did not sufficiently affect the election atmosphere as to require election invalidation is not supported by substantial evidence. Petitioner also appears to contend that the Board and hearing officer incorrectly interpreted the applicable law.

In *Sewell Mfg. Co.,* 138 N.L.R.B. 66 (1962), the Board first stated its test for when campaign propaganda raising racial issues requires invalidation of an election. In an effort to persuade employees to vote against the union, the employer circulated materials linking the union to racial inte-

gration, including a photograph of a white male union leader dancing with a black woman. The Board invalidated the election on the ground that the employer's deliberate, sustained appeal to prejudice had "exceeded permission [sic] limits and so inflamed and tainted the atmosphere in which the election was held that a reasoned basis for choosing or rejecting a bargaining representative was an impossibility." *Id.* at 72.[7] The Board set forth the following principles for determining when an appeal to prejudice requires election invalidation. It recognized that some appeals inevitably arise during campaigns and must be tolerated. "Standards must be high, but they cannot be so high that for practical purposes elections could not effectively be conducted." *Id.* at 70. Whether an appeal exceeds tolerable bounds depends on its kind and intensity. *Id.* at 71. The Board stated its test as to appeals by parties:

> So long ... as a party limits itself to *truthfully* setting forth another party's position on matters of racial interest and does not deliberately seek to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals, we shall not set aside an election on this ground. However, the burden will be on the party making use of a racial message to establish that it was truthful and germane, and where there is doubt as to whether the total conduct of such party is within the described bounds, the doubt will be resolved against him.

We have not yet applied the *Sewell* rule in this circuit. *Sewell* involved the prejudiced message of a party. Here, in contrast, we must determine whether prejudiced remarks by an employee who is not a party's agent require election invalidation.

The Eleventh Circuit has addressed the issue of when a third-party's appeal to prejudice requires invalidation of an election. In *M & M Supermarkets, Inc. v. NLRB,*

---

7. The Board's reasoning flows from its function, which is:

> to conduct elections in which the employees have the opportunity to cast their ballots in an atmosphere conducive to the sober and informed exercise of the franchise, free ... from ... elements which prevent or impede a reasoned choice....

> Appeals to racial prejudice on matters unrelated to the election issues ... create conditions which make impossible a sober, informed exercise of the franchise. *Id.* at 70–71.

818 F.2d 1567, 1573 (11th Cir.1987) (quoting *NLRB v. Golden Age Beverage Co.*, 415 F.2d 26, 32–33 (5th Cir.1969)), the Eleventh Circuit stated the following test: Acts not attributable to a party require election invalidation if they "destroyed the atmosphere necessary to the exercise of a free choice in the representation election." The Eleventh Circuit drew this test from what it deemed the analogous context of third-party threats during representation campaigns. *Id.* at 1572 (citing *Golden Age*, 415 F.2d at 32–33). *Golden Age*, 415 F.2d at 32–33, held that third-party threats "may ... warrant setting aside an election if ... [they] disrupted the voting procedure or destroyed the atmosphere necessary to the exercise of a free choice in the representation election."

We think that the Eleventh Circuit's approach in developing a separate third-party test by analogy to the context of coercive misconduct is correct. First, the approach accords with our practice of giving less weight to third-party than to party misconduct in evaluating the impact of such misconduct on elections. *See May*, 707 F.2d at 432; *NLRB v. Sauk Valley Mfg. Co.*, 486 F.2d 1127, 1131 (9th Cir.1973). We discount third-party misconduct because: (1) employees will attribute less importance to other employees' " 'possibly impulsive' " conduct " 'induced in the heat of a campaign' " than to a party's planned conduct; and (2) as a practical matter parties cannot prevent supporters' misconduct, so that attaching the same weight to third-party and party actions "would lead to endless and pointless repetitions of elections." *May*, 707 F.2d at 432–33 (quoting *Sauk*, 486 F.2d at 1131 n. 5). Second, the coercion and slur contexts are analogous because, in both,

the essential question before the Board is whether the misconduct impaired employees' free choice.

As to the impact of third-party threats, we have stated that, "[t]o overturn an election, 'employee conduct must be coercive and disruptive conduct or other action ... *so aggravated that a free expression of choice of representative is impossible.'* " *NLRB v. Eskimo Radiator Mfg. Co.*, 688 F.2d 1315, 1319 (9th Cir.1982) (quoting *NLRB v. Aaron Bros. Corp.*, 563 F.2d 409, 412 (9th Cir.1977)) (citation omitted).[8] *See also May*, 707 F.2d at 432. We now adopt an analogous standard as to third-party appeals to prejudice: To require election invalidation, an employee's appeal to prejudice must so taint the election atmosphere as to render free choice of representation impossible.[9]

Contreras's remarks were reprehensible and could not conceivably have been germane to any legitimate election issue. As *NLRB v. Silverman's Men's Wear, Inc.*, 656 F.2d 53, 58 (3d Cir.1981), stated in considering an anti-semitic remark:

[T]he remark, rather than identifying any position of the Employer, can typically serve only to spotlight the minority religion of the Company's principal. Such a remark has no purpose except blatantly to exploit religious prejudices of the voters.... There is no question of truth or falsity in a slur such as this. We can see no reason for the remark except to inflame and incite religious or racial tensions.

*Id.* at 58. To the extent a comparison between the owner's wealth and the employees' poverty might have been relevant,

---

**8.** We originally took the quoted language from a case from the old Fifth Circuit (now the Eleventh Circuit). *See Bush Hog, Inc. v. NLRB*, 420 F.2d 1266, 1269 (5th Cir.1969) (quoted by *Aaron Bros.*, 563 F.2d at 412). Accordingly, the standard we adopt today is closely related to that stated by *M & M Supermarkets*.

**9.** The Hearing Officer applied the standard of "whether the statement could have impaired the employees' freedom of choice in the subsequent election." This standard is too inclusive. Further, the cases cited by the Hearing Officer for that standard, *NLRB v. Katz*, 701 F.2d 703 (7th Cir.1983), and *American Enka Co.*, 231 N.L.R.B.

1335, 1342 (1977), provide only weak support for it. *Katz* adopted the standard without explanation from a case that did not assert it and involved neither third-party conduct nor prejudiced remarks. *See Katz*, 701 F.2d at 707 (citing *Advertisers Mfg. Co. v. NLRB*, 677 F.2d 544, 546 (7th Cir.1982)). *American Enka* nowhere stated the cited test and one of the people who made the racial remarks at issue was arguably a union agent. The Hearing Officer's use of an overly inclusive standard does not warrant remand; obviously the Hearing Officer would have reached the same result under the correct, narrower standard we state.

"the point could have been made without resort to a religious slur." *NLRB v. Katz,* 701 F.2d 703, 706 (7th Cir.1983).

Contrary to respondent's suggestion, Contreras's remarks did not constitute an attempt to raise the consciousness of a disadvantaged minority electorate, such as was tolerated in *NLRB v. Sumter Plywood Corp.,* 535 F.2d 917, 929 (5th Cir.1976), *cert. denied,* 429 U.S. 1092, 97 S.Ct. 1105, 51 L.Ed.2d 538 (1977). In *Sumter,* the union distributed to a mainly black electorate a cartoon depicting "Uncle Tom" as an obstacle to unionism, a union organizer stated that the union could help redress blacks' "slavery," and union supporters used black power salutes. The Fifth Circuit found these actions acceptable efforts to equate unionism with black economic betterment, not efforts to incite blacks against whites. In contrast, Contreras sought to set the Mexican employees against the "gringo," Jewish owner.

However, the Board and hearing officer correctly interpreted and applied the law in finding that the incident involving Contreras did not so taint the campaign atmosphere as to render free choice of representative impossible. The incident was isolated and did not reflect the theme of the Union's campaign, which focused on legitimate issues. *See State Bank of India v. NLRB,* 808 F.2d 526, 542 (7th Cir.1986), *cert. denied,* 483 U.S. 1005, 107 S.Ct. 3229, 97 L.Ed.2d 735 (1987). The slurs did not involve a sustained, pervasive appeal to prejudice such as occurred in *YKK (U.S. A.), Inc.,* 269 N.L.R.B. 82 (1984) (Board set aside election where union sought to incite anti-Japanese sentiment by repeatedly referring to Pearl Harbor and World War II and by inundating workplace with anti-Japanese epithets). Because Contreras uttered the slurs in a heated discussion, the employees who overheard them probably discounted them as impulsively made. *See Sauk,* 486 F.2d at 1131 n. 5.

Contreras held no position of influence over his co-workers, and the Union took no action even remotely suggesting ratification of his remarks. Thus, the instant case differs from *Katz,* 701 F.2d 703, one of the two circuit cases involving third-party comments cited by petitioner. In that case, the union conducted meetings of the predominantly Catholic electorate at a Catholic church. In urging employees to vote for the union, the priest discussed the movie "Holocaust" and said, "Paul and Mrs. Katz [the owners] are Jewish and ... getting rich while we're getting poor," and "why should we make them [the owners] rich because Jewish people are rich and we are poor and killing ourselves for them." The union never explicitly repudiated the priest's statements and continued to hold meetings in the church. In holding that the allegations stated a prima facie case for election invalidation, the Seventh Circuit emphasized that, even though the priest was not directly authorized to speak for the union, "[t]he likelihood that a priest would influence the employees' decision ... in this context is great." *Id.* at 707.

In the other third-party case cited by petitioner, *M & M Supermarkets,* 818 F.2d 1567, an outspoken union supporter told other employees at a company meeting:

> The damn Jews who run this Company are all alike. They pay us pennies out here in the warehouse, and take all their money to the bank. The Jews ought to remember their roots. Norton Malaver ought to remember his roots. Us blacks were out in the cotton field while they, the damned Jews, took their money from the poor hardworking people.... Those damned Jews are no good.

*Id.* at 1569–70.[10] Setting aside the election, the Eleventh Circuit concluded that "the remarks were so inflammatory and derogatory" that they destroyed the conditions necessary for a free election. *Id.* at 1573. The above remarks are indistinguishable in tenor and tone from those of Contreras. We disagree, however, with the Eleventh Circuit's conclusion that they destroyed

---

10. *Katz* noted that the union won the election by a vote of nine to seven, so a change of one vote would have yielded a tie and thus changed the election result. In the instant case, a change in the votes of the three employees who heard Contreras's comments (given the six challenged ballots and the election margin of eleven to six) could conceivably have changed the election results. Nevertheless, Contreras's remarks did

free choice. Such isolated statements of a rank-and-file employee, at least under the instant facts, do not so taint an election atmosphere as to undermine free choice.

Considering the totality of circumstances, Contreras's remarks, although vile and seething with prejudice, do not warrant invalidation of the election. In light of election realities, they fall within the category of offensive but isolated appeals to prejudice, the evaluation of which we must leave to "the good sense and judgment of the electorate." *Sewell Mfg. Co.*, 138 N.L.R.B. 66, 70 (1962).

## CONCLUSION

Substantial evidence supports the Board's findings crediting only one incident of slurs by Contreras and no incidents of fee waiver promises. The Board correctly interpreted and applied the law in finding that Contreras was not a Union agent in uttering the slurs and the slurs do not warrant setting aside the election.

Accordingly, the Board's Decision and Order are

AFFIRMED.

not sufficiently taint the election atmosphere, as    discussed.