**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ASHLAND FACILITY OPERATIONS,
LLC, d/b/a Ashland Nursing &
Rehabilitation Center,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS
BOARD,

*Respondent,*

No. 11-2004

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
Local 400,

*Intervenor.*

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner,*

UNITED FOOD AND COMMERCIAL
WORKERS INTERNATIONAL UNION,
Local 400,

*Intervenor,*

No. 11-2132

v.

ASHLAND FACILITY OPERATIONS,
LLC, d/b/a Ashland Nursing &
Rehabilitation Center,

*Respondent.*

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
(5-CA-60739)

Argued: September 20, 2012

Decided: December 14, 2012

Before KING, GREGORY, and WYNN, Circuit Judges.

---

Petition denied; enforcement granted by published opinion. Judge Wynn wrote the opinion, in which Judge King and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** James Phillip Naughton, HUNTON & WIL-LIAMS, LLP, Norfolk, Virginia, for Ashland Facility Operations. Fred B. Jacob, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the National Labor Relations Board. John Andrew Durkalski, BUTSAVAGE & ASSO-CIATES, PC, Washington, D.C., for United Food and Commercial Workers International Union, Local 400. **ON BRIEF:** Kimberlee W. DeWitt, HUNTON & WILLIAMS, LLP, Richmond, Virginia, for Ashland Facility Operations. Lafe E. Solomon, Acting General Counsel, Celeste J. Mattina, Deputy General Counsel, John H. Ferguson, Associate General Counsel, Linda Dreeben, Deputy Associate General Counsel, Ruth E. Burdick, Supervisory Attorney, Heather S. Beard, Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for the National Labor Relations Board.

**OPINION**

WYNN, Circuit Judge:

Ashland Facility Operations, LLC ("Ashland Facility") petitions for review of a National Labor Relations Board (the "Labor Board") order that Ashland Facility cease and desist from refusing to bargain with the United Food and Commercial Workers International Union, Local 400 (the "Union"). In a cross-application, the Labor Board requests enforcement of its order.

On appeal, Ashland Facility contends that allegedly racially inflammatory remarks by King Salim Khalfani, executive director of the Virginia State Conference NAACP, undermined the validity of a representation election certifying the Union as the exclusive bargaining representative of certain Ashland Facility employees. The Labor Board, however, found that neither Khalfani nor the Virginia NAACP was a Union agent and that Khalfani's remarks, made months before the election, did not taint the results. Because we conclude that the Union was properly certified, we deny Ashland Facility's petition for review and enforce the Labor Board's order.

I.

A.

Ashland Facility operates a 190-bed skilled nursing facility north of Richmond, Virginia. On a Saturday evening in February 2010, an African-American certified nursing assistant ("CNA") alleged that between $200 and $250 had been stolen from her purse. Six members of the nursing crew, five of whom were African-American and one of whom was Caucasian, were paged to the nurses' station by two supervising nurses and forced to empty their purses so that their supervisors could check for the missing money. The two supervisors also told one nurse to remove her shoes and one or two others

to remove their jackets. The following Monday, the nurses met with Charles Nelson, Ashland Facility's then-executive director, to complain about their treatment. Nelson apologized, and the two supervisors who had initiated the search were suspended and later terminated.

In late April 2010, Khalfani sent a letter to Nelson alleging discriminatory treatment of Ashland Facility's African-American employees, specifically referencing the February incident. On May 10, 2010, Khalfani held a press conference, attended by about fifty members of the media, during which he decried the treatment of the "Ashland Six," his moniker for the six CNAs subjected to the search. J.A. 209. At the press conference, some of the nurses claimed they were "targeted because of their skin color, publicly and illegally strip-searched, ridiculed and later harassed." J.A. 209. One of the six nurses, Andrea Anderson, also claimed that during winter snowstorms in early 2010, the nurses were told that they could not leave the building and had to sleep on the floor and get food from vending machines. Khalfani said Ashland Facility's employees had been treated like "chattel enslaved captives," and that Ashland Facility was a "cesspool of inhumanity that needs to be told and fixed." J.A. 209. Khalfani's allegations were published on the front page of the May 12-18, 2010 issue of the *Richmond Voice*, a weekly newspaper circulated widely in Richmond, and in the monthly newsletter of a local radio station. His claims were also broadcast on several television and radio news programs in May and June 2010.

On the same day as the press conference, Khalfani emailed three members of the Ashland Six to set up a meeting with representatives of the Union. Khalfani introduced the nurses to Ken Pinkard, a vice president of the Union and one of thirty-two members of the Virginia NAACP's executive board. After June 2010, Khalfani did not provide any assistance to the Union in its efforts to organize Ashland Facility's employees.

B.

On September 21, 2010, the Union filed a petition to represent a bargaining unit of "[a]ll regular full-time and part-time CNAs, restorative aides, activity aides, and maintenance employees; Excluding all RNs, PRNs, dietary employees, office clerical employees, confidential employees, and guards and supervisors as defined in the Act." J.A. 575. This marked the beginning of the so-called "critical period"—the time between the filing of a representation petition and the representation election. The parties subsequently agreed to hold the election on November 3, 2010.

One Ashland Facility employee reported that after the petition was filed, she frequently heard other employees discussing the alleged strip search of the CNAs and the "slave-like conditions" at Ashland Facility. J.A. 358-59. Another employee said that in the time leading up to the election, there were rumors that only the African-American nurses had been "strip-searched," not the Caucasian nurse, and that Ashland Facility was firing all of its African-American employees. J.A. 133, 135. Other employees often discussed "call[ing] the NAACP" and "get[ting] the Union in so it would be fair for everybody." J.A. 133. None of the witnesses identified who initially made or repeated these statements.

Greg Ashley, who succeeded Nelson as Ashland Facility's executive director, held eighteen meetings and had "numerous conversations" with the nursing staff in the weeks leading up to the election. J.A. 146. He held the meetings "specifically to talk about why [he] didn't feel the Union would be in their best interest and how [he] could solve whatever issues were at hand." *Id.* Ashley said that during the meetings, employees frequently raised concerns about the alleged strip search, the treatment of staff during the snowstorms, and discriminatory treatment of African-American employees.

The Union requested that Elizabeth Waddy, president of the Hanover County NAACP, draft a letter endorsing the

Union. On October 27, 2010, approximately one week before the election, Waddy sent a brief letter to Ashland Facility employees stating, "Dear Health Care Caregivers: The Hanover County Branch of the NAACP supports [the Union] in representing the Caregivers at Consulate Health Care [Ashland Facility], Ashland, Virginia. VOTE YES!!" J.A. 206. As planned, the Labor Board held a secret-ballot election on November 3, in which 31 votes were cast for, and 28 were cast against, the Union.

C.

Ashland Facility filed objections to the election, alleging in particular that "[t]he Union's campaign was based in whole or in substantial part on unlawful appeals to racial prejudice."* J.A. 2. Following a hearing, an administrative law judge ("ALJ") overruled Ashland Facility's objections and certified the Union as the exclusive bargaining representative of the named bargaining unit. The Labor Board subsequently affirmed the ALJ's recommendation. On June 6, 2011, the Union sent a letter to Ashland Facility requesting that it bargain collectively with the Union about the terms and conditions of employment of Ashland Facility's workers. In response, Ashland Facility stated it believed that the November 2010 election was invalid and, consequently, refused to bargain.

The Union filed a charge against Ashland Facility on June 30, 2011, asking the Labor Board to compel Ashland Facility to negotiate. Two weeks later, the Labor Board's Acting General Counsel issued a complaint against Ashland Facility, alleging that it had engaged in unfair labor practices in violation of the National Labor Relations Act (the "Act"). *See* 29

---

*Ashland Facility also charged that the Union engaged in unlawful election-day conduct and that "the election was tainted by improper, prounion supervisor conduct." J.A. 2-3. Neither of these claims is at issue on appeal.

U.S.C. § 158(a)(1), (a)(5). Ashland Facility admitted that it had refused to bargain with the Union, but claimed it was not obligated to do so because the election "was invalid and fatally tainted by the Union's misconduct." J.A. 723. The Acting General Counsel then filed a Motion for Summary Judgment on grounds that Ashland Facility did not present any evidence or assert issues other than those already litigated in prior proceedings. On September 16, 2011, the Labor Board granted the motion and ordered, inter alia, Ashland Facility to bargain with the Union.

Ashland Facility petitioned this Court for review, arguing that the Labor Board should have set aside the results of the representation election because it was improperly tainted by Khalfani's allegedly racially inflammatory comments. In particular, Ashland Facility maintains that the Labor Board erroneously held the Virginia NAACP was not an agent of the Union; failed to apply the appropriate legal standard for reviewing results of elections tainted by improper, racially inflammatory comments; and mistakenly found Khalfani's prepetition comments were unrelated to improper conduct occurring during the critical period. The Labor Board, in turn, filed a cross-application for enforcement of its order.

## II.

The results of a union representation election supervised by the Labor Board are "presumptively valid." *NLRB v. Flambeau Airmold Corp.*, 178 F.3d 705, 707 (4th Cir. 1999). The Labor Board's factual determinations are "conclusive" if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f); *see also Sam's Club, a Div. of Wal-Mart Stores, Inc. v. NLRB*, 173 F.3d 233, 239 (4th Cir. 1999). In reviewing mixed questions of law and fact, "the [Labor] Board's application of legitimate legal interpretations to the facts of a particular case should be upheld if they are supported by substantial evidence based upon the record as a whole." *Sam's Club*, 173 F.3d at 239. "Substantial evidence

is 'more than a scintilla' but 'less than a preponderance' of evidence." *Id.* (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

A union representation election should be conducted in a metaphorical "laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees." *General Shoe Corp.*, 77 NLRB 124, 127 (1948). That being said, it has long been recognized that representation elections are "heated affair[s]" and, consequently, an election will not be set aside "unless an atmosphere of fear and coercion rendered free choice impossible." *NLRB v. Herbert Halperin Distrib. Corp.*, 826 F.2d 287, 290 (4th Cir. 1987).

### A.

Ashland Facility first argues that the Virginia NAACP was an actual or apparent agent or "close ally" of the Union when Khalfani made the allegedly inflammatory statements, and thus the Labor Board should have scrutinized the election results more closely. Whether the Virginia NAACP was an agent of the Union is significant because "[l]ess weight is accorded the comments and conduct of third parties than to those of the employer or union" since "third parties are not subject to the deterrent of having an election set aside, and third party statements do not have the institutional force of statements made by the employer or the union." *Herbert Halperin*, 826 F.2d at 290.

Conduct by a union or its agents can be a basis for setting aside an election "when threats, acts of coercion, or other improprieties occurred and 'materially affected the election results.'" *NLRB v. Ky. Tenn. Clay Co.*, 295 F.3d 436, 442 (4th Cir. 2002) (quoting *Herbert Halperin*, 826 F.2d at 290). By contrast, third-party conduct provides a basis for invalidating an election "only if the election was held in a general atmosphere of confusion, violence, and threats of violence, such as

might reasonably be expected to generate anxiety and fear of reprisal, to render impossible a rational uncoerced expression of choice as to bargaining representation." *Herbert Halperin*, 826 F.2d at 290 (quotation omitted).

Generally, whether an agency relationship exists is a factual determination. *Metco Prods., Inc. v. NLRB*, 884 F.2d 156, 159 (4th Cir. 1989). Therefore, a finding by the Labor Board that an agency relationship does not exist "will not be disturbed on appeal if supported by substantial evidence on the record as a whole." *Id.* (citations omitted).

This Court determines whether an agency relationship exists according to the common law of agency. *Id.* Actual agency exists "when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006). A putative agent has apparent authority "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* § 2.03. In the context of labor representation elections, the final inquiry into agency "is always whether the amount of association between the Union and [a third party] is significant enough to justify charging the Union with the conduct." *PPG Industs., Inc. v. NLRB*, 671 F.2d 817, 822 n.8 (4th Cir. 1982).

Ashland Facility does not argue that the Union expressly authorized the Virginia NAACP or Khalfani to act as its agent for purposes of the organizing campaign. Instead, it contends that the Virginia NAACP was an apparent agent of the Union. In support of this proposition, Ashland Facility primarily relies on our decision in *Kentucky Tennessee Clay Company*.

In that case, we found two employees were apparent agents of a union when "professional union organizers had delegated a number of specific organizing tasks to the unpaid employee

organizers, including having the authorization cards signed by the other employees, talking with the employees about the union both in the plant and outside the plant, distributing union literature, and helping to plan union meetings. . . . [T]hese employees were the union's only in-plant contact with the other employees." *Ky. Tenn. Clay Co.*, 295 F.3d at 444. In fact, the Court found hardly "any participation whatsoever" by the union official responsible for overseeing the organizing campaign, whereas the putative agent employees "were instrumental in every step of the campaign process." *Id.* at 443, 445.

In its brief, Ashland Facility highlights what it contends constitutes evidence of a close relationship between the Union and the Virginia NAACP. For example, Ashland Facility notes that Khalfani helped arrange the initial meeting between members of the Ashland Six and the Union; Union Vice President Pinkard was also a member of the Virginia NAACP's thirty-two-member executive board; and Hanover County NAACP President Waddy sent a letter to employees endorsing the Union. However, this evidence falls far short of showing that the Virginia NAACP was "instrumental in every step of the campaign process." *Id.* at 443.

Indeed, *Kentucky Tennessee Clay Company* can readily be distinguished in a number of ways. Whereas the apparent agents in *Kentucky Tennessee Clay Company* were actively involved in the organizing campaign throughout the precertification campaign and critical period, *id.* at 443, Khalfani had no involvement in the campaign after June 2010, more than two months before the start of the critical period. In the *Kentucky Tennessee Clay Company* organizing campaign, the one union official was only "minim[ally] involve[d]," *id.* at 445, whereas here, the Union had three employees who were actively involved in the organizing campaign, ran all organizing meetings, and called employees to discuss the Union. This is an ample factual basis to support the Labor Board's finding that the Virginia NAACP was not the Union's agent.

## B.

Next, Ashland Facility argues that even if the Virginia NAACP is not an agent of the Union, the Labor Board erred in not subjecting the election results to heightened scrutiny because Khalfani's comments were racially inflammatory. In particular, Ashland Facility contends that the Labor Board should have applied the standard of review set out in *Sewell Manufacturing Company*, 138 NLRB 66 (1962), which held that when a party to an election "deliberately seek[s] to overstress and exacerbate racial feelings by irrelevant, inflammatory appeals," the party making such appeals bears the burden of showing they are "truthful and germane" to the election. *Id.* at 72. But *Sewell* is inapplicable for two reasons: (1) Khalfani's comments were not "inflammatory" appeals to racial prejudice and (2) *Sewell* does not govern appeals to racial prejudice made by third-parties.

First, the *Sewell* standard applies only if an appeal to racial sentiment is "inflammatory." *Case Farms of N.C., Inc. v. NLRB*, 128 F.3d 841, 845 (4th Cir. 1997). An appeal to prejudice is inflammatory if it "can have no purpose except to inflame the racial feelings of voters in the election." *Id.* (quoting *Englewood Hospital*, 318 NLRB 806, 807 (1995)). The limitation of *Sewell* to irrelevant appeals to racial prejudice stems from the recognition that "matters of race and ethnicity will often be important to a representation campaign." *Id.*; *see also NLRB v. Baltimore Luggage Co.*, 387 F.2d 744, 747-48 (4th Cir. 1967). Consequently, while "[a]ttempts to portray an employer as bigoted have . . . been found to be inflammatory in certain extreme cases," in general, appeals to racial prejudice will not be a basis for overturning an election so long as they are made in the context of an effort to raise workplace grievances or other issues of legitimate concern to employees. *Case Farms*, 387 F.3d at 846.

Under this standard, this Court, on a number of occasions, has refused to vitiate the results of an otherwise valid repre-

sentation election in cases where entities advocating unionization raised race and ethnicity as part of a campaign focused on legitimate concerns of workers. For example, *Case Farms* involved an organizing campaign at a poultry processing plant, during which the union circulated fliers suggesting that the company had replaced Amish workers at another plant with Latino workers "[b]ecause they could pay Latinos less and treat them worse." *Id.* at 843. We rejected Case Farm's petition to overturn the election certifying the union on grounds that the flier was an improper appeal to racial prejudice, stating that the fliers reflected the primary issues of the organizing campaign: "wages and working conditions." *Id.* at 849. Similarly, in *Herbert Halperin*, this Court found that the use of racial epithets, apparently by an African-American employee, during the course of a representation campaign was not a basis to overturn the election where the comments were made in the context of complaints about wages and working conditions. 826 F.2d at 293. Finally, during the representation election at issue in *Baltimore Luggage*, the NAACP distributed a letter to the largely African-American workforce endorsing the union and noting that the union had assisted the NAACP "in our civil rights struggles." 387 F.2d at 745. We held that the NAACP's endorsement was not a basis to invalidate the election, noting that "it is highly pertinent for the predominantly Negro electorate to be told of the NAACP's support of the Union and the advantages which unionization and union tactics, and particularly this Union's favorable attitude, have secured for Negroes." *Id.* at 747-48.

When viewed in light of this precedent, Khalfani's comments fall short of being "inflammatory." Although Khalfani's comments appealed to matters of race, they were not inflammatory because they were made in the context of raising legitimate concerns about the working conditions of CNAs at Ashland Facility-including the search of the so-called Ashland Six and the treatment of employees during the snowstorms.

Second, even assuming arguendo that Khalfani's comments were "inflammatory," Ashland Facility still must overcome the fact that, to date, this Court has only applied *Sewell* in cases in which such comments were made by a party to the election. *See, e.g.*, *Case Farms*, 128 F.3d at 845-46. The Virginia NAACP was not a party to the election but was, instead, a third party. In fact, there is some confusion in this Circuit regarding the appropriate level of scrutiny for elections potentially tainted by inflammatory third-party appeals to racial prejudice. *Compare Flambeau Airmold*, 178 F.3d at 708 (majority opinion) (asserting that the *Herbert Halperin* Court applied the level of scrutiny used for improper third-party election conduct to third-party appeals to prejudice), *with id.* at 713 (Niemeyer, J., dissenting) (noting that this Court did not find appeals to racial prejudice to be "inflammatory" in *Herbert Halperin* and thus did not set out appropriate standard for "inflammatory" appeals to prejudice).

Our sister Circuits have not adopted a uniform approach to reviewing representation elections potentially tainted by inflammatory third-party appeals to racial prejudice. In particular, there is confusion as to whether, and to what extent, *Sewell* applies in such cases. *See NLRB v. Foundry Div. of Alcon Indus., Inc.*, 260 F.3d 631, 635 n.6 (6th Cir. 2001). The Seventh Circuit has suggested that *Sewell* applies to third-party racially inflammatory comments, finding that such remarks require invalidation of an election if "the inflammatory remarks could have impaired the employees' freedom of choice in the subsequent election." *NLRB v. Katz*, 701 F.2d 703, 706-07 (7th Cir. 1983).

By contrast, the Ninth and Eleventh Circuits elected not to extend *Sewell* to inflammatory third-party appeals to racial prejudice, instead analogizing such appeals to threats and other coercive conduct by third-parties. *See Did Bldg. Servs., Inc. v. NLRB*, 915 F.2d 490, 497-98 (9th Cir. 1990); *M & M Supermarkets, Inc. v. NLRB*, 818 F.2d 1567, 1572-73 (11th Cir. 1987). Under this approach, an election must be invali-

dated only if a third-party's "appeal to prejudice . . . so taint-[ed] the election atmosphere as to render free choice of representation impossible." *Did Bldg. Servs.*, 915 F.2d at 498; *see also M & M Supermarkets*, 818 F.2d at 1572-73 (holding that third-party appeals to racial prejudice warrant invalida-tion of an election if they "destroyed the atmosphere neces-sary to the exercise of a free choice in the representation election" (quotations omitted)).

We agree with the Ninth and Eleventh Circuits and decline to extend *Sewell* to racially inflammatory comments made by third-parties. The *Sewell* burden-shifting approach is poorly suited to third-party appeals to prejudice for two reasons. First, as the Ninth Circuit correctly explained in *Did Building Services*, "parties cannot prevent supporters' misconduct, so . . . attaching the same weight to third-party and party actions would lead to endless and pointless repetitions of elections." 915 F.2d at 498 (internal quotation omitted). In fact, "[b]ecause it would be impossible to know which side a third party favored, secretly pro-company employees could spread inflammatory rumors favorable to the union, thus invalidating the union's anticipated victory, and vice versa." *Flambeau Airmold*, 178 F.3d at 713 (Niemeyer, J., dissenting). Second, were we to apply the *Sewell* burden-shifting approach, it would create the absurd result that a party would bear the bur-den of defending the veracity and relevance of comments made by an entity not party to the case and for which it was not responsible.

We also find the Ninth and Eleventh Circuits' analogy to third-party coercive conduct persuasive. This approach appro-priately balances the need to minimize irrelevant appeals to racial prejudice in representation elections with our long-established position that third-party actions should be accorded less weight in determining whether an election should be invalidated. This Court sets aside a representation election based on third-party threats or other coercive conduct if the conduct "render[ed] impossible a rational, uncoerced

expression of choice." *Herbert Halperin*, 826 F.2d at 290 (quotation omitted). Therefore, we hold that an inflammatory third-party appeal to racial prejudice is the basis for invalidating a representation election only if the appeal made a rational, uncoerced expression of free choice impossible.

Under this standard, Ashland Facility has failed to make a sufficient showing to invalidate the election. The record includes no evidence that Khalfani's comments, made months before the election, rendered it impossible for employees to freely decide whether to certify the Union as their exclusive bargaining agent. Moreover, to the extent that Khalfani's comments may have caused confusion, Ashland Facility had ample opportunity to address this confusion and set the record straight at the eighteen meetings it held with employees during the critical period.

## C.

Even assuming arguendo that Khalfani's comments are a potential basis for overturning the election, Ashland Facility still must overcome the fact that the comments were made prior to the critical period. Generally, the Labor Board "will not consider instances of prepetition conduct as a basis upon which to set aside an election." *Dresser Indus. Inc.*, 242 NLRB 74, 74 (1979). However, improper conduct occurring before the critical period may be considered when "such conduct adds meaning and dimension to related postpetition conduct." *Id.* Under this standard, prepetition conduct may be considered when it is of a similar nature to objectionable conduct that occurs during the critical period.

For example, in *In re BCI Coca-Cola Bottling Co.*, 339 NLRB 67 (2003), the Labor Board found that an employer's prepetition threats to eliminate its 401(k) program if employees joined a union were relevant when the employer made similar threats regarding the 401(k) program during the critical period. *Id.* at 67-68. Similarly, in *Dresser* the Labor Board

set aside the results of a representation election where an employer interrogated and threatened employees in the prepetition period and then engaged in similar misconduct only a few days before the election. 242 NLRB at 74-75.

Here, Ashland Facility fails to identify any conduct occurring during the critical period similar to the inflammatory comments made by Khalfani prior to certification. Although rumors circulated amongst Ashland Facility's employees regarding the Ashland Six and the treatment of employees during the snowstorms, there is no evidence that these rumors are attributable to the Union or its agents. *See Brightview Care Center*, 292 NLRB 352, 352-53 (1989) (holding that "isolated remarks made by unidentified employees, apparently in the course of casual conversations among employees," did not provide an adequate basis for setting aside a representation election).

Ashland Facility also contends Hanover NAACP President Waddy's letter endorsing the Union constitutes critical period conduct related to Khalfani's prepetition statements. Although the ALJ found that Waddy was a Union agent in drafting the letter, the brief letter states simply that the Hanover NAACP supports the Union, does not reference Khalfani's comments, and lacks any appeal to racial prejudice. Therefore, the Labor Board correctly found that even if the Virginia NAACP had been an agent of the Union, Khalfani's prepetition statements did not provide a basis for setting aside the election.

## III.

In its brief, Ashland Facility also maintains that it was denied due process of law because the ALJ improperly limited the temporal scope of Ashland Facility's subpoena to the Virginia NAACP and failed to enforce the subpoena sua sponte before certifying the election. This argument is without merit.

The Act provides that hearings conducted before the Labor Board, and ALJs as delegatees of the Labor Board, "shall, so far as practicable, be conducted in accordance with the rules of evidence applicable in the district courts . . . ." 29 U.S.C. § 160(b). In this Circuit, district courts "enjoy nearly unfettered discretion to control the timing and scope of discovery . . . ." *Hinkle v. City of Clarksburg, W. Va.*, 81 F.3d 416, 426 (4th Cir. 1996).

Here, the ALJ limited the scope of Ashland Facility's subpoena duces tecum on the Virginia NAACP to records from the critical period. Given the latitude afforded to lower courts on discovery issues and the limited role prepetition conduct plays in assessing the validity of a representation election, the restriction was not improper.

Moreover, while the Act empowers the Labor Board to seek court aid in enforcing its discovery orders, 29 U.S.C. § 161(2), there is no requirement that an ALJ enforce such an order sua sponte, *see Skyline Builders, Inc.*, 340 NLRB 109, 109 (2003) (when a party does not seek judicial enforcement of its subpoena, a judge is "under no obligation to continue the hearing or to seek enforcement of the subpoena sua sponte").

On December 16, 2010, the ALJ closed the record subject to reopening if Ashland Facility obtained further "material" evidence. J.A. 375-76. At that time, the ALJ said that Ashland Facility should contact him within a week if it had any additional evidence to add to the record before he rendered his decision. Ashland Facility did not request enforcement of its subpoena to the Virginia NAACP and failed to contact the ALJ within the required timeframe. Under these circumstances, it was within the ALJ's sound discretion to move forward with his decision to certify the election.

## IV.

For the foregoing reasons, Ashland Facility's petition is denied, and the decision of the Labor Board is enforced.

No. 11-2004 *PETITION DENIED*
No. 11-2132 *ENFORCEMENT GRANTED*